[Cite as *Natl. Church Residences First Community Village v. Kessler*, 2023-Ohio-1437.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## UNION COUNTY

NATIONAL CHURCH RESIDENCES
FIRST COMMUNITY VILLAGE,

    **PLAINTIFF-APPELLEE,**               **CASE NO. 14-22-22**

    **v.**

KATHY KESSLER,

                                   **O P I N I O N**

    **DEFENDANT-APPELLANT.**

Appeal from Union County Common Pleas Court
Trial Court No. 2020-CV-0128

**Judgment Reversed and Cause Remanded**

**Date of Decision:    May 1, 2023**

**APPEARANCES:**

    *Vincent P. Zuccaro* **for Appellant**

    *David S. Brown* **for Appellee**

Case No. 14-22-22

**ZIMMERMAN, J.**

{¶1} Defendant-appellant, Kathy Kessler ("Kessler"), appeals the October 5, 2022 judgment of the Union County Court of Common Pleas granting summary judgment in favor of defendant-appellee, National Church Residences First Community Village ("National Church"). We reverse.

{¶2} On September 8, 2020, National Church filed a breach-of-contract and promissory-estoppel complaint seeking damages from Kessler for services provided to Kessler's mother, Rosa McGlone ("McGlone"), for McGlone's nursing-facility care from November 1, 2017 through March 31, 2018.[1] McGlone was admitted to National Church's First Community Village nursing home on August 15, 2016. Because McGlone "suffered from dementia and was unable to care for herself or handle her own finances," Kessler executed National Church's Nursing Facility Admission Agreement (the "agreement") on August 24, 2016. (Doc. No. 57). (*See also* Doc. No. 2, Ex. 1). Importantly, the parties do not dispute that Kessler did not execute the agreement in her personal capacity; rather, *they agree that she executed the agreement in her representative capacity for McGlone.* (*See* Doc. No. 57); (Appellee's Brief at 7).

{¶3} On August 25, 2016, the Ohio Department of Job and Family Services ("ODJFS") informed the parties that it approved McGlone's Medicaid benefits. The

---

[1] McGlone died on June 8, 2019.

-2-

benefits included the cost of McGlone's nursing-facility care. Pertinently, that notice informed the parties that McGlone was eligible for a category of Medicaid benefits with a resource limit of $2,000.00.[2]

{¶4} Even though Kessler retained primary access to McGlone's account with US Bank as her attorney in fact, National Church "was authorized to sign [McGlone's] Social Security checks for deposit only to be applied to [her] balance." (Doc. No. 57). In 2016 and 2017, McGlone received monthly direct deposits from the Social Security Administration (for $727.00) into her US Bank account. As a result of those deposits, McGlone's US Bank account accumulated a balance of $7,164.67 as of August 15, 2017. Consequently, on August 15, 2017, ODJFS sent Kessler a "Medicaid Eligibility Review Verification Request List, seeking information related to [McGlone's] assets" to which Kessler responded on August 30, 2017 by providing McGlone's bank statements. (*Id.*). Because McGlone's assets exceeded the $2,000.00 threshold, her Medicaid benefits were terminated. However, ODJFS notified *only* Kessler and McGlone (on August 31, 2017) of its termination of McGlone's Medicaid benefits (without providing a reason).

{¶5} Even though McGlone's benefits had been terminated, Medicaid continued to pay for her care through September 30, 2017. National Church became aware of the termination of McGlone's Medicaid benefits on November 14, 2017

---

[2] "In August 2016, [McGlone] maintained a checking account at US Bank with a balance of $838.98." (Doc. No. 57).

when it "ran an Eligibility Search * * * ." (*Id.*). "The Eligibility Search did not indicate why [McGlone's] Medicaid terminated." (*Id.*). Critically, National Church failed to contact ODJFS (between November 14, 2017 and February 2018) or Kessler (between November 14, 2017 and January 8, 2018) to discuss McGlone's Medicaid-benefit termination. Nevertheless, on January 8, 2018, National Church issued a statement for McGlone's care for $42,620.99 (for October 2017 through January 2018) to Kessler, but sent the statement to a wrong address.

{¶6} On February 20, 2018, National Church emailed Kessler requesting that she execute "another Authorized Representative Form, so that [National Church] could reapply for Medicaid for [McGlone]." (*Id.*). Kessler responded to that email that *same day*, and National Church submitted "a new Medicaid application on behalf of [McGlone]" *that same day*. (*Id.*). On April 2, 2018, Kessler "spent down [McGlone's checking account] by issuing National Church two checks [from McGlone's account] totaling $10,483.67." (*Id.*).

{¶7} ODJFS approved McGlone's re-application for Medicaid benefits on February 29, 2019 "retroactive to April 1, 2018." (*Id.*). "ODJFS's determination on the February 20, 2018, [sic] Medicaid application was delayed because of a communication error between ODJFS's system, and the Central Ohio Area Agency on Aging's system." (*Id.*).

{¶8} The parties stipulated that "[t]he $10,483.67 payment was used to satisfy [McGlone's] private pay balance for the month of October." (*Id.*). Consequently, the parties agree that McGlone's private pay balance for the care that she received from November 1, 2017 through March 31, 2018 is $50,116.82 and that the Medicaid reimbursement rate for that time period is $33,861.06.

{¶9} Kessler filed her answer to National Church's complaint on October 15, 2020. Thereafter, on December 29, 2020, Kessler filed a motion for a judgment on the pleadings under Civ.R. 12(C), arguing that she cannot be held personally liable for McGlone's debt. On January 11, 2021, National Church filed a memorandum in opposition to Kessler's motion for a judgment on the pleadings, arguing that Kessler's liability stems from the breach of her duty "to pay from the resident's funds and to obtain and maintain Medicaid on behalf of the resident." (Doc. No. 12). Kessler filed her reply to National Church's memorandum in opposition to her motion for a judgment on the pleadings on February 18, 2021. On April 1, 2021, the trial court denied Kessler's motion for a judgment on the pleadings after concluding "that there are a set of facts that would support" National Church's breach-of-contract and promissory-estoppel claims against Kessler. (Doc. No. 16).

{¶10} On November 15, 2021, National Church filed a motion for summary judgment in which it argued there are no genuine issues of material fact that Kessler breached the agreement "because she failed to take necessary action to ensure that

[McGlone's] assets remained within allowable limits for Medicaid, resulting in the termination of [McGlone's] Medicaid benefits for being over resourced." (Doc. No. 37). On December 20, 2021, Kessler filed a memorandum in opposition to National Church's motion for summary judgment along with a motion for leave to file a motion for summary judgment instanter, which the trial court denied. On January 14, 2022, National Church filed its reply to Kessler's memorandum in opposition to its motion for summary judgment. On February 10, 2022, the trial court denied National Church's motion for summary judgment after concluding that "[b]oth [National Church] and [Kessler] failed to timely address the notice from Medicaid regarding the later ineligibility of [McGlone] for Medicaid benefits." (Doc. No. 48).

**{¶11}** Kessler filed a motion for summary judgment on March 25, 2022, arguing that there is no genuine issue of material fact that she did not agree to be personally liable for McGlone's debt.[3] (Doc. No. 59). On October 5, 2022, the trial court granted National Church's request for reconsideration of its motion for summary judgment, denied Kessler's motion for summary judgment, and granted summary judgment in favor of National Church. (Doc. No. 60). Specifically, the trial court concluded that there are no genuine issues of material fact that Kessler breached *McGlone's admission agreement* by failing to maintain McGlone's Medicaid eligibility. Consequently, the trial court awarded National Church

---

[3] The parties filed joint stipulations of fact on March 16, 2022. (Doc No. 57).

$33,861.06—"[t]he Medicaid reimbursement rate for" "the care provided to [McGlone] from November 1, 2017 through March 31, 2018"—in damages. (*Id.*).

**{¶12}** Kessler filed her notice of appeal on November 2, 2022. She raises two assignments of error for our review, which we will address together.

### Assignment of Error No. I

**The Trial Court erred in denying Defendant's Motion for Summary Judgment.**

### Assignment of Error No. II

**The Trial Court erred in granting Plaintiff's Motion for Summary Judgment.**

**{¶13}** In her assignments of error, Kessler argues that the trial court erred by denying her motion for summary judgment and granting summary judgment in favor of National Church because there is no genuine issue of material fact that the agreement constitutes "an unlimited, involuntary, and unlawful personal guarantee." (Appellant's Brief at 9). Similarly, Kessler contends that there is no genuine issue of material fact that she did not agree to be personally liable for McGlone's debt.

### *Standard of Review*

**{¶14}** We review a decision to grant summary judgment de novo. *Doe v. Shaffer*, 90 Ohio St.3d 388, 390 (2000). "De novo review is independent and without deference to the trial court's determination." *ISHA, Inc. v. Risser*, 3d Dist.

Allen No. 1-12-47, 2013-Ohio-2149, ¶ 25, citing *Costner Consulting Co. v. U.S. Bancorp*, 195 Ohio App.3d 477, 2011-Ohio-3822, ¶ 10 (10th Dist.). Summary judgment is proper where there is no genuine issue of material fact, the moving party is entitled to judgment as a matter of law, and reasonable minds can reach but one conclusion when viewing the evidence in favor of the non-moving party, and the conclusion is adverse to the non-moving party. Civ.R. 56(C); *State ex rel. Cassels v. Dayton City School Dist. Bd. of Edn.*, 69 Ohio St.3d 217, 219 (1994).

{¶15} "The party moving for summary judgment has the initial burden of producing some evidence which demonstrates the lack of a genuine issue of material fact." *Carnes v. Siferd*, 3d Dist. Allen No. 1-10-88, 2011-Ohio-4467, ¶ 13, citing *Dresher v. Burt*, 75 Ohio St.3d 280, 292 (1996). "In doing so, the moving party is not required to produce any affirmative evidence, but must identify those portions of the record which affirmatively support his argument." *Id.*, citing *Dresher* at 292. "The nonmoving party must then rebut with specific facts showing the existence of a genuine triable issue; he may not rest on the mere allegations or denials of his pleadings." *Id.*, citing *Dresher* at 292 and Civ.R. 56(E).

*Analysis*

{¶16} In this case, the trial court granted summary judgment in favor of National Church after concluding that Kessler breached McGlone's admission agreement by failing to "promptly act to maintain [McGlone's] eligibility for

Medicaid." (Doc. No. 60). Specifically, the trial court concluded that Kessler breached the admission agreement by failing to (1) "manage [McGlone's] checking account * * * in a manner that would ensure continued Medicaid eligibility from November 3, 2016 through April 1, 2018"; (2) "take any action until [National Church] contacted [her] via email in February 2018" "upon receipt of the notice of termination"; and (3) "timely address the Medicaid termination once [National Church] became aware of the same." (*Id.*). Based on that conclusion, the trial court also denied Kessler's motion for summary judgment.

{¶17} "A cause of action for breach of contract requires the claimant to establish the existence of a contract, the failure without legal excuse of the other party to perform when performance is due, and damages or loss resulting from the breach." *Lucarell v. Nationwide Mut. Ins. Co.*, 152 Ohio St.3d 453, 2018-Ohio-15, ¶ 41. However, "'"[a] contract is binding only upon parties to a contract and those in privity with them."'" *Gilchrist v. Saxon Mtge. Servs.*, 10th Dist. Franklin No. 12AP-556, 2013-Ohio-949, ¶ 23, quoting *DVCC, Inc. v. Med. College of Ohio*, 10th Dist. Franklin No. 05AP-237, 2006-Ohio-945, ¶ 19, quoting *Samadder v. DMF of Ohio, Inc.*, 154 Ohio App.3d 770, 2003-Ohio-5340, ¶ 25 (10th Dist.). "Privity is defined as '[t]he connection or relationship between two parties, each having a legally recognized interest in the same subject matter.'" *Bohan v. Dennis C.*

*Jackson Co., L.P.A.*, 188 Ohio App.3d 446, 2010-Ohio-3422, ¶ 12 (8th Dist.), quoting *Shoemaker v. Gindlesberger*, 118 Ohio St.3d 226, 2008-Ohio-2012, ¶ 10.

**{¶18}** In this case, the parties do not dispute that Kessler executed McGlone's admission agreement in her capacity as McGlone's representative. (Doc. No. 57). In other words, there is no dispute that Kessler did not execute the agreement in her personal capacity. *Accord Vancrest Mgt. Corp. v. Mullenhour*, 3d Dist. Allen No. 1-18-59, 2019-Ohio-2958, ¶ 14.

**{¶19}** An "agent" is a person "'who is authorized to act for or in place of another; a *representative*.'" (Emphasis added.) *Marion v. Cendol*, 3d Dist. Marion No. 9-12-59, 2013-Ohio-3197, ¶ 16, quoting *Black's Law Dictionary* 72 (9th Ed.2009), and citing *John Hancock Mut. Life Ins. Co. v. Luzio*, 123 Ohio St. 616 (1931), syllabus (proposing that, "[i]n the absence of statutory definition, the term 'agent,' * * * should be given its legal meaning, as being one who is acting within the scope of his authority in the business intrusted [sic] to him by his principal"). *See also* R.C. 1337.22(A) (defining an agent as "a person granted authority to act for a principal under a power of attorney, whether denominated an agent, attorney in fact, or otherwise"). Generally, "'[w]here an agent acts for a disclosed principal, in the name of such principal, and within the scope of authority, such agent is ordinarily not liable on the contracts the agent makes.'" *Whitt Sturtevant, LLP v. NC Plaza LLC*, 10th Dist. Franklin No. 14AP-919, 2015-Ohio-3976, ¶ 96, quoting

*Oelberg v. Skaggs*, 10th Dist. Franklin No. 97APE10-1383, 1998 WL 292231, *2 (June 4, 1998).

**{¶20}** Because Kessler is not a party to the agreement (in her individual capacity), she could not have breached it. *Accord Gilchrist*, 2013-Ohio-949, at ¶ 23 ("Because appellee was not a party to the TPP, it could not have breached it."). As a result, National Church's ability to recover from Kessler for debt incurred by McGlone is limited since Kessler (in her personal capacity) is not a party to the contract. *See Vancrest* at ¶ 14, citing *Huntington Natl. Bank v. A & J Plumbing, Inc.*, 11th Dist. Geauga No. 2011-G-3021, 2012-Ohio-526, ¶ 27, *Extendicare Health Servs., Inc. v. Dunkerton*, 11th Dist. Portage, 2017-Ohio-427, ¶ 28, and *Gilchrist* at ¶ 23. *See also Classic Healthcare Sys., LLC v. Faun Miracle*, 12th Dist. Warren No. CA2017-03-029, 2017-Ohio-8540, ¶ 33 (Powell, P.J., dissenting) ("Under traditional agency principles, the agent (David) is never liable for the obligations of the principal (Faun) unless the agent enters into an obligation but fails to disclose his role as an agent for the principal.").

**{¶21}** Importantly, "R.C. 1337.092(A) precludes personal liability when a party enters into a contract in a representative capacity as attorney in fact and discloses that representative capacity in the contract * * * ." *Gilchrist* at ¶ 18. *See also Vancrest* at ¶ 15 (noting that R.C. 1337.092 provides "that 'the attorney in fact is not personally liable on the contract, unless the contract otherwise specifies'"),

quoting R.C. 1337.092(A). R.C. 1337.092 "sets forth exceptions to that general rule and provides, in its relevant part, as follows:

> (B) An attorney in fact is not personally liable for a debt of the attorney in fact's principal, unless one or more of the following applies:
>
> (1) The attorney in fact agrees to be personally responsible for the debt.
>
> * * *
>
> (3) The negligence of the attorney in fact gave rise to or resulted in the debt."

*Vancrest* at ¶ 15, quoting R.C. 1337.092(B)(1), (3). Critically, because National Church failed to raise the applicability of R.C. 1337.092 in the trial court, it waived any argument relative to the statue for purposes of appeal. *Accord Village at the Greene v. Smith*, 2d Dist. Montgomery No. 28762, 2020-Ohio-4088, ¶ 18; *Vancrest* at ¶ 17; *Extendicare* at ¶ 31. *See also Gilchrist* at ¶ 21-22.

{¶22} For these reasons, we conclude that Kessler cannot be held liable for breaching McGlone's admission agreement since she has no contractual privity to the agreement and because National Church failed to allege *an alternative means* for recovery under its breach-of-contract claim under R.C. 1337.092. *See Gilchrist* at ¶ 26 (concluding that because "no contract existed between appellant and appellee pursuant to R.C. 1337.092(A)," there was no breach).

**{¶23}** Even if Kessler was in privity to McGlone's admission agreement, we conclude that there is no genuine issue of material fact that Kessler did not breach the agreement *in the manner described* by National Church. That is, contrary to National Church's argument, there is no triable issue that Kessler did not breach the provision of the agreement requiring her "'to act promptly to establish and maintain [McGlone's] eligibility for Medicaid, including, but not limited to, taking any and all necessary action to ensure that [McGlone's] assets are appropriately reduced to and remain within allowable limits for Medicaid as established by applicable law.'" (Appellee's Brief at 19, quoting Doc. No. 37, Ex. 1). *See HCF of Findlay, Inc. v. Bishop*, 3d Dist. Hancock No. 5-18-20, 2019-Ohio-319, ¶ 8 (assuming "without deciding that the parties executed a valid contract, * * * there [was] no genuine issue of material fact that [the resident's representative] did not breach the contract in the manner described by [the nursing facility]").

**{¶24}** "In order to determine whether there was a breach of the contract, we must interpret the terms of the contract." *HCF of Findlay* at ¶ 9. "When confronted with an issue of contract interpretation, our role is to give effect to the intent of the parties." *Id.* "'Courts presume that the intent of the parties to a contract resides in the language they chose to employ in the contract.'" *Id.*, quoting *Judson v. Lyendecker*, 10th Dist. Franklin No. 12AP-615, 2013-Ohio-1060, ¶ 12. "'Ordinary words in a written contract must be "given their ordinary meaning unless manifest

absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument.""" *Id.*, quoting *Nippon Life Ins. Co. of Am. v. One Source Mgt., Ltd.*, 6th Dist. Lucas No. L-10-1247, 2011-Ohio-2175, ¶ 22, quoting *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241 (1978), paragraph two of the syllabus.

**{¶25}** """If a contract is clear and unambiguous, then its interpretation is a matter of law and there is no issue of fact to be determined.""" *Id.* at ¶10, quoting *Barhorst, Inc. v. Hanson Pipe & Prods. Ohio, Inc.*, 169 Ohio App.3d 778, 2006-Ohio-6858, ¶ 10 (3d Dist.), quoting *Inland Refuse Transfer Co. v. Browning-Ferris Industries of Ohio, Inc.*, 15 Ohio St.3d 321, 322 (1984). "In that case, we apply a de novo standard of review." *Id.*

**{¶26}** Without addressing the validity of the agreement here, we conclude that the agreement is clear and unambiguous. *Accord id.* at ¶11 (concluding that the terms of the contract at issue in that case requiring the resident's representative to cooperate in the Medicaid application process were clear and unambiguous). Indeed, the agreement designates, in its relevant part that "the Representative agrees to pay from his/her own resources any unpaid charges due to Facility as a result of the Representative's failures to *cooperate* in the Medicaid eligibility or redetermination process." (Doc. No. 2, Ex. 1). Regarding Medicaid, the agreement instructs, in its relevant part, as follows:

E4. <u>Medicaid Residents</u>.

* * *

b. <u>Responsibility for Payment if Medicaid Coverage Denied or Terminated</u>. You are responsible for applying or renewing the Resident's Medicaid coverage. While Facility may assist You in applying for Medicaid coverage, Facility does not guarantee that Medicaid coverage will be available to the Resident. If the Resident's application for Medicaid coverage is denied or if the Resident becomes ineligible at any time for Medicaid coverage, You shall be required to pay Facility the private-pay rate for all charges incurred by the Resident.

* * *

E5. <u>Medicaid Applications</u>.

a. <u>Notification for Advance Planning</u>. You agree to inform Facility when the Resident's assets reach $20,000. In addition, if the Resident does not have monthly income sufficient to pay for the cost of care and services (e.g., Basic Rate and for Additional Services), You agree to apply for Medicaid or to promptly make arrangements to pay for the Resident's continued stay at Facility when the Resident's assets reach $5,000.

(*Id.*). Significantly, the agreement defines "cooperate" to mean:

d. <u>Cooperation in Application Process</u>. You are obligated to make full and complete disclosure regarding all financial resources and income during the Medicaid application process, and to cooperate fully in providing all requested information. You agree to act promptly to establish and maintain the Resident's eligibility for Medicaid, including, but not limited to, taking any and all necessary action to ensure that the Resident's assets are appropriately reduced and remain within allowable limits for Medicaid as established by applicable law.

(Emphasis sic.) (*Id.*).

-15-

{¶27} Based on our review of the record, we disagree with the trial court's conclusion that Kessler "failed to comply with the Admission Agreement insomuch as [she] did not promptly act to maintain McGlone's eligibility for Medicaid." (Doc. No. 60). Rather, reasonable minds can conclude only that Kessler *cooperated* in the Medicaid eligibility process in the manner described in the contract. Indeed, based on the facts and circumstances of this case, there is no genuine issue of material fact that Kessler acted promptly to establish McGlone's eligibility for Medicaid as required under the agreement. *Compare HCF of Findlay* at ¶ 13 (concluding "that there [was] no genuine issue of material fact that [the resident's representative] acted promptly to establish [the resident's] eligibility for Medicaid").

{¶28} Likewise, there is no triable issue that Kessler made a full and complete disclosure of McGlone's financial resources and income during the Medicaid application process and that she *cooperated* fully by providing all requested information. *Compare id.* at ¶ 14 (concluding "that there [was] no genuine issue of material fact that [the resident's representative] made a full and complete disclosure of [the resident's] financial resources and income during the Medicaid application process and cooperated fully in providing all requested information").

{¶29} To illustrate, the record reflects that, in each instance that Kessler was instructed to take specific action, she timely responded. Specifically, Kessler

responded (with the requested information) to ODJFS's August 15, 2017 request for information regarding McGlone's assets on August 30, 2017. *See id.* at ¶ 18. ODJFS notified only Kessler and McGlone (on August 31, 2017) that it denied McGlone's application for Medicaid benefits. Significantly, ODJFS did not provide a reason to Kessler or McGlone for its decision to terminate McGlone's benefits.

{¶30} Even though ODJFS notified only Kessler and McGlone of its decision terminating McGlone's Medicaid benefits, Medicaid continued to pay for McGlone's care through September 30, 2017. Moreover, National Church did not conduct "an Eligibility Search" until November 14, 2017 to ascertain McGlone's Medicaid-eligibility status. Notwithstanding the results of the search reflecting that McGlone's Medicaid benefits were terminated, National Church waited to attempt to contact Kessler for nearly two months (when it sent a statement to the wrong address on January 8, 2018).

{¶31} Nevertheless, National Church further waited until February 20, 2018 to again try to contact Kessler. On that day, National Church emailed Kessler requesting that she execute "*another* Authorized Representative Form, so that [National Church] could reapply for Medicaid for [McGlone]." (Emphasis added.) (Doc. No. 57). Kessler responded to National Church's email *that same day*, and National Church submitted "a new Medicaid application on behalf of [McGlone]" that same day. (*Id.*). Consequently, viewing the evidence in favor of Kessler (as

the non-moving party here), reasonable minds can conclude only that Kessler *cooperated* in the Medicaid-eligibility process in the manner described in the agreement.

**{¶32}** Furthermore, reasonable minds can conclude only that Kessler acted promptly to establish McGlone's Medicaid eligibility as required under the agreement. Critically, neither the notice sent to Kessler and McGlone by ODJFS nor National Church's eligibility search provided *a reason* for the decision terminating McGlone's benefits. Nevertheless, shortly after National Church established communication with Kessler, Kessler "spent down [McGlone's checking account] by issuing National Church two checks totaling $10,483.67" on April 2, 2018. (Doc. No. 57). Consequently, we conclude that the record reflects that Kessler *cooperated* in the Medicaid-eligibility process by acting within a reasonable amount of time to establish or maintain McGlone's Medicaid eligibility. *Compare HCF of Findlay* at ¶ 15 (concluding that the resident's representative "cooperated in the Medicaid redetermination process in the manner described in the contract" because she "took the necessary action to appropriately reduce [the resident's] assets to the allowable limit to be eligible for Medicaid benefits").

**{¶33}** For these reasons, we conclude that there is no genuine issue of material fact that Kessler did not breach the agreement by failing to *cooperate* in

the Medicaid-eligibility process in the manner described in the agreement. *Accord id.* at ¶19.

**{¶34}** Notwithstanding our conclusions, it is judicious for this court to address the argument presented under Kessler's second assignment of error. In sum, Kessler contends that the trial court erred by denying her motion for summary judgment because there is no genuine issue of material fact that the agreement constitutes "an unlimited, involuntary, and unlawful personal guarantee" and that there is no genuine issue of material fact that she did not agree to be personally liable for McGlone's debt. (Appellant's Brief at 9). We agree. Importantly, it is *undisputed* that Kessler did not expose herself to individual liability for the expenses incurred for McGlone's care when she executed the agreement as McGlone's representative. *Accord Village at the Greene*, 2020-Ohio-4088, at ¶ 19 (concluding "that Smith, in executing the contract with Village as Father's representative (whether through his power of attorney or otherwise), did not become subject to individual liability for the expenses incurred for Father's care").

**{¶35}** Generally, federal and state regulations under the Nursing Home Reform Act "provide that a nursing home cannot make a third-party guarantee a requirement for admission or for a continued stay in the facility." *Classic Healthcare*, 2017-Ohio-8540, at ¶ 32 (Powell, P.J., dissenting). *See also Cook Willow Health Ctr. v. Andrien*, 54 Conn. L. Rptr. 729, 2012 WL 5200369, *3 (Sept.

28, 2012) (noting that a nursing-facility agreement "unambiguously complies with" federal regulations when "'it expressly prohibits personal liability on the part of the defendant for payments made to [a nursing facility] from [a resident's] account,' and second, 'the contract obligates the defendant to use [the resident's] assets for the payment of services'"), quoting *Sunrise Healthcare Corp. v. Azarigian*, 76 Conn.App. 800, 808 (2003). *See generally Manahawkin Convalescent v. O'Neill*, 217 N.J. 99, 116, 85 A.3d 947 (2014) (characterizing the Nursing Home Reform Act as "Congress's statutory scheme intended to protect nursing home residents and their families"), citing Omnibus Budget Reconciliation Act of 1987, Pub.L. No. 100203, § 4211, 101 Stat. 1330, 182, 182-221 (1987). "Indeed, 'federal law has long barred nursing homes accepting either Medicaid or Medicare from compelling third party guarantees of resident payment, but permits such facilities to require individuals with legal access to the resident's assets to pay for the resident's care with such assets.'" *Vancrest* at ¶ 18, quoting *Manahawkin Convalescent* at 116.[4]

{¶36} In particular, one component of the federal-statutory scheme provides, "[w]ith respect to admissions practices a nursing facility must * * * not require a third party guarantee of payment to the facility as a condition of admission (or

---

[4] *See* Pearson, *The Responsible Thing to Do About "Responsible Party" Provisions in Nursing Home Agreements: A Proposal for Change on Three Fronts*, 37 U. Mich. J.L. Reform 757, 777-778 (2004) (discussing the application of traditional-agency theory to third-party liability provisions of nursing-facility agreements); *Heiby Oil Co. v. Pence*, 3d Dist. Auglaize No. 2-99-02, 1999 WL 378370, *2 (June 3, 1999) (discussing traditional agency law).

Case No. 14-22-22

expedited admission) to, or continued stay in the facility." 42 U.S.C. 1396r(c)(5)(A)(ii). However,

> [s]ubparagraph (A)(ii) shall not be construed as preventing a facility from requiring an individual, who has legal access to a resident's income or resources available to pay for care in the facility, to sign a contract (*without incurring personal financial liability*) to provide payment from the resident's income or resources for such care.

(Emphasis added.) 42 U.S.C. 1396r(c)(5)(B)(ii).[5] *See Manahawkin Convalescent* at 116 (suggesting that the regulation distinguishes "between a nursing home resident's assets in the control of a third party, which may be pursued by the facility, and that third party's personal funds, which are beyond the facility's reach"). Somewhat more restrictively, the Code of Federal Regulations provides, in its relevant part, as follows:

> (3)   The facility must not request or require a third party guarantee of payment to the facility as a condition of admission or expedited admission, or continued stay in the facility.  However, the facility may request and require a resident representative who has legal access to a resident's income or resources available to pay for facility care to sign a contract, *without incurring personal financial liability*, to provide facility payment from the resident's income or resources.

(Emphasis added.) 42 C.F.R. 483.15(a)(3).[6] Finally, Ohio's regulation provides, in its relevant part, as follows:

> (C)   A provider of a [Nursing Facility] shall not:

---

[5] "Similar language appears in [42 U.S.C. 1395i-3(c)(5)(A)(ii) and (B)(ii)], which govern skilled nursing facilities that accept Medicare." *Manahawkin Convalescent v. O'Neill*, 217 N.J. 99, 116, 85 A.3d 947 (2014).
[6] "42 C.F.R. 483.15(A)(3) * * * was amended in October 2016 to prohibit facilities from requesting a third-party guarantee of payment." *Montefiore Home v. O'Donnell*, 8th Dist. Cuyahoga No. 107074, 2018-Ohio-5238, ¶ 6.

-21-

* * *

(4)  Require a third party to accept personal responsibility for paying the facility charges out of his or her own funds.  However, the facility may require a representative who has legal access to an individual's income or resources available to pay for facility care to sign a contract, *without incurring personal financial liability*, to provide facility payment from the individual's income or resources if the individual's medicaid application is denied and if the individual's cost of care is not being paid by medicare or another third-party payor.  A third-party guarantee is not the same as a third-party payor (i.e., an insurance company), and this provision does not preclude the facility from obtaining information about medicare and medicaid eligibility or the availability of private insurance.  The prohibition against third-party guarantees applies to all individuals and prospective individuals in all certified [nursing facilities] regardless of payment source.  This provision does not prohibit a third party from voluntarily making payment on behalf of an individual.

(Emphasis added.)  Ohio Adm.Code 5160-3-02(C)(4).[7][8]

{¶37} Here, there is no genuine issue of material fact that Kessler did not personally guarantee payment for McGlone's care under the agreement.  Indeed, the parties (as well as the trial court) agree that Kessler *did not* assume personal liability for McGlone's debt under the agreement.  *See Extendicare*, 2017-Ohio-427, at ¶ 28

---

[7] "'Resources' means cash, funds held within a financial institution, investments, personal property, and real property an individual and/or the individual's spouse has an ownership interest in, has the legal ability to access in order to convert to cash, and is not legally prohibited from using for support and maintenance." Ohio Adm.Code 5160:1-1-01.

[8] *See* Pearson, 37 U. Mich. J.L. Reform at 782-783 (suggesting that the "roles" of third-party signers can be susceptible to "alternative, inconsistent means" and that roles identified, for instance, as "attorney in fact"; "responsible party"; "representative"; "guarantor;" or "sponsor" are not mutually exclusive).  *See also Meadowbrook Center, Inc. v. Buchman*, 149 Conn.App. 177, 201-203, 90 A.3d 219 (2014) (addressing the nuances of third-party identifiers in admission agreements); *Manahawkin Convalescent*, 217 N.J. at 120 (concluding that the "cause of action was not defined in sufficient detail * * * and was not properly pled" because it was unclear whether the nursing home was asserting its claim against O'Neill in her fiduciary capacity or against her individually).

(emphasizing that "[a]ppellant signed the admission agreement and the payor confirmation as his father's attorney-in-fact, and neither document provides that appellant was [his father's] voluntary guarantor"). *See also Village at the Greene*, 2020-Ohio-4088, at ¶ 19 (noting that "Smith specifically disclaimed in writing any intent or willingness to assume personal responsibility for Father's charges").

{¶38} Notwithstanding the parties' agreement that Kessler did not personally guarantee payment for McGlone's care, National Church maintains that Kessler is personally liable for breaching the provisions of the agreement requiring her to cooperate in the Medicaid-eligibility process. Importantly, in support of its argument, National Church directs this court to the provision of the agreement providing, in relevant part, that "'the Representative agrees to pay from his/her own resources any unpaid charges due to Facility as a result of the Representative's failure to *cooperate* in the Medicaid eligibility or redetermination process.'" (Emphasis added.) (Appellee's Brief at 7, quoting Doc. No. 2, Ex. 1).

{¶39} We previously addressed our concern with the inclusion of provisions in nursing-facility agreements imposing personal liability on a resident's representative, but ultimately determined that the issue was not ready for review. *See Vancrest*, 2019-Ohio-2958, at ¶ 19 (resolving that "we are constricted by the notions of due process from addressing the applicability of the Federal Nursing Home Reform Act and corresponding Ohio regulations" in that case since it was not

properly before the court). We are not so constrained here. Therefore, we conclude that provisions in a nursing-facility agreement purporting to impose "personal liability on a resident's representative who does not voluntarily agree to assume that responsibility" violates federal and Ohio law. *Village at the Greene* at ¶ 24.

**{¶40}** To be clear, the provision of the agreement providing that "the Representative agrees to pay from his/her own resources any unpaid charges due to Facility as a result of the Representative's failure to cooperate in the Medicaid eligibility or redetermination process" is unenforceable. (Doc. No. 2, Ex. 1). *See Village at the Greene* at ¶ 25 (concluding that the nursing home was "not entitled to enforce [the] provision" it "required Smith to sign in order to admit Father to Village's care[, which] provided that Smith 'agree[d] to pay from his/her own resources any unpaid charges due to [Village] as a result of the Representative's [Smith's] failure to cooperate in the Medicaid eligibility process'"). Specifically, such contract provision directly contravenes "the provisions of 42 U.S.C. 1396r(c)(5)(A)(ii), 42 C.F.R. 483.15(a)(3), and Ohio Adm.Code 5160-3-02(C)(4) * * * ." *Id.*

**{¶41}** Critically, the bounds of Ohio and federal law authorize nursing facilities to *only* request and require the resident's representative (with legal access to the resident's assets) to pay for the resident's care with such assets (*without* incurring personal-financial responsibility). *See Inova Health Systems Services,*

*Inc. v. Bainbridge,* 81 Va.Cir. 39, 2010 WL 7765105, *4 (July 19, 2010) ("It is clear * * * that Congress did not want nursing homes to force others not in privity, such as a resident's family member, to assume personal financial responsibility for the care of the resident."), citing H.R. Rep. No. 104-651 (1996).

**{¶42}** In this case, it is undisputed that Kessler complied with federal and state law by paying for McGlone's care by exhausting McGlone's assets after her Medicaid benefits were terminated. *See, e.g.*, Ohio Adm.Code 5160-3-02(C)(4) (authorizing, in relevant part, that "the facility may require a representative who has legal access to an individual's income or resources available to pay for facility care to sign a contract, *without incurring personal financial liability*, to provide facility payment from the individual's income or resources if the individual's medicaid application is denied"). That is, the parties agree that Kessler paid National Church $10,483.67 from McGlone's checking account in April 2018. Consequently, there is no genuine issue of material fact that Kessler fulfilled her statutory responsibilities.[9] Thus, we conclude that any provision of the agreement imposing

---

[9] There is no evidence in the record whether National Church pursued the debt from McGlone's estate. *See Classic Healthcare Systems, LLC v. Faun Miracle*, 12th Dist. Warren No. CA2017-03-029, 2017-Ohio-8540, ¶ 35 (Powell, P.J., dissenting) (noting that "[w]ithout the ability to proceed against [the resident's representative], [the nursing facility] was limited to pursuing the debt from [the resident]. However, the record reflects that [the resident] died shortly before the trial commenced and [the nursing facility] voluntarily dismissed its claims against her instead of substituting her estate" and that "[t]he record contains no indication whether an estate was opened for [the resident]" but the nursing facility, "as [the resident's] creditor, had the ability to open her estate and present claims within the time permitted by statute").

personal liability is void and any claim that Kessler is liable for McGlone's debt is without merit.

**{¶43}** Nevertheless, National Church maintains that it "has not sought to hold [Kessler] personally liable for the expenses incurred by Ms. McGlone. If it had, it would have sought damages in the amount of $50,858.87. Instead [National Church] simply sought" $33,861.06. (Appellee's Brief at 13). National Church's argument—being raised for the first time on appeal—is not only disingenuous but does not change the outcome of our analysis.

**{¶44}** It is well-settled that a party cannot change their theory of the case and present new arguments for the first time on appeal. *Brewer v. Brewer*, 10th Dist. Franklin No. 09AP-146, 2010-Ohio-1319, ¶ 23. Indeed, in its motion for summary judgment National Church unequivocally demanded that the trial court award it $50,806.82 in damages as a result of its claim that Kessler breached the agreement. (*See* Doc. No. 37).

**{¶45}** Moreover, National Church's argument contradicts the term of its agreement reflecting that the resident "shall be required to pay Facility the private-pay rate for all charges incurred by the Resident" "[i]f the Resident's application for Medicaid coverage is denied or if the Resident becomes ineligible at any time for Medicaid coverage." (Doc. No. 37, Ex. 1). Thus, based on our conclusions regarding Kessler's privity to the agreement and the propriety of any provision in

the agreement purporting to personally obligate Kessler to pay McGlone's debt, National Church's argument is feckless.

{¶46} For these reasons, Kessler's assignments of error are sustained.

{¶47} Having found error prejudicial to the appellant herein in the particulars assigned and argued, we reverse the judgment of the trial court and remand for further proceedings consistent with this opinion.

***Judgment Reversed and***
***Cause Remanded***

**MILLER, P.J. and WALDICK, J., concur.**

**/jlr**