[Cite as *Otterbeing Maineville, L.L.C. v. Carman*, 2025-Ohio-1013.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY


| | | |
|---|---|---|
| OTTERBEIN MAINEVILLE, LLC, | : | CASE NO. CA2024-07-052 |
| Appellee, | : | |
| | : | O P I N I O N<br>3/24/2025 |
| - vs - | : | |
| | : | |
| JOAN A. CARMAN, ET AL., | : | |
| Appellants. | : | |


CIVIL APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
Case No. 22CV95111


Rolf Goffman Martin Lange, LLP, and W. Cory Phillips and David S. Brown, for appellee.

Pro Seniors, Inc., and Tracye T. Hill and Miriam H. Sheline, for appellants.


**M. POWELL, J.**

{¶ 1} Defendants, Joan Carman and Douglas Carman (collectively, "the Carmans"), appeal the Warren County Court of Common Pleas's disposition of cross-motions for summary judgment. The Carmans contest the court's grant of summary judgment to Plaintiff, Otterbein Maineville, LLC ("Otterbein"), on claims of unjust enrichment and breach of contract, a counterclaim under the Ohio Consumer Sales

Practices Act, and the court's imposition of joint and several liability. After review of the record and the arguments presented, we find no basis to disturb the trial court's decisions.

## I. Factual and Procedural Background

{¶ 2} This appeal arises from a nursing home payment dispute. The case centers on Joan Carman, an elderly woman with dementia who required nursing-home care, and her son Douglas Carman, who helped arrange to secure that care at Otterbein, a long-term care facility in Warren County, Ohio.

{¶ 3} In March 2021, following Joan's hospitalization, Douglas met with Otterbein's representative Brandy Glass to arrange his mother's admission. From the outset, Douglas made clear that Joan would rely on Medicaid to cover her care costs. The admission process required two critical documents. First, Douglas signed a "Financial Disclosure Form" as "Douglas Carman POA," explicitly indicating his role as power of attorney. Second, he signed a "Consent to Treat & Admission Agreement" (the "Agreement") simply as "Douglas R. Carman" beneath the designation "ELDER/Responsible Party." Notably, Joan herself never signed the Agreement.

{¶ 4} The Agreement's terms merit careful attention, as they define the scope of the parties' obligations. At its foundation, the Agreement established three distinct parties: "Otterbein Maineville - SNF ('Otterbein')," Joan Carman (designated as the "Elder"), and "the Representative(s) whose names appear below." Critically, the Agreement employed the terms "You" and "Your" to create joint and several obligations between the Elder and Representative. While the Agreement expressly shielded Douglas from personal guarantee of payment, it imposed specific fiduciary duties on him as Representative:

> **A1. Duty to Pay**. You agree to pay all charges and fees that are billed to You by Otterbein when they become due. You agree to use Elder's income, assets, personal and real property, and resources, including, but not limited to, social security, pension or retirement funds, annuities, insurance,

bank accounts, and mutual funds (collectively, "Resources") to pay the charges when due, and agree to liquidate any Resources to pay such charges.

"Exhibit A - Financial Terms."[1]

**B2. No Personal Guarantee.** The Representative is not personally guaranteeing payment to Otterbein, and nothing in this Agreement is to be construed as a personal guarantee of payment. All payment obligations refer to payment from the Resident's Resources (as defined below). All financial obligations in this Agreement are the Resident's; however, You have asserted to Otterbein that the Representative shall act in a fiduciary capacity on the Resident's behalf to satisfy the Resident's financial obligations under this Agreement, and the Representative agrees to act in such a fiduciary capacity. The Representative agrees to pay Otterbein from the Resident's Resources for services provided to the Resident.

**B3. Legal Authority to Access Resident's Funds.** You have asserted that the Representative has legal access to and control over the Resident's income, assets, personal, and real property, and resources, including, but not limited to, social security, pension or retirement funds, annuities, insurance, bank accounts, and mutual funds (collectively "Resources"), and You understand that Otterbein is entering into this Agreement in reliance on that assertion. You agree that all such Resources shall be considered the Resident's Resources for purposes of this Agreement. You agree to take all steps necessary to prevent any of these Resources from transferring by operation of law while the Resident still has outstanding debts to Otterbein.

. . .

**B5. Diversion of Resident's Resources.** The Representative agrees to be a good financial steward of all of the Resident's Resources. The Representative agrees not to withhold, use for personal use, misappropriate or redirect the Resident's Resources, and to immediately inform Otterbein if he or she learns that someone else has done so.

"Exhibit B - Representative Authority & Duties."

**C2. Term & Termination.** . . .

. . .

---

1. Exhibit A, as well as Exhibits B and C, were expressly incorporated by reference into the Agreement.

- 3 -

> . . . You agree not to willfully impair the Elder's ability to meet his or her financial obligations in this Agreement, and You understand that Otterbein may terminate this Agreement if You willfully refuse to pay for the services covered under this Agreement even though the Elder has sufficient resources to do so. . . . You agree at all times to pay whatever amount the Elder can towards the full charges for services provided, and, subject to any claim by a governmental agency, to convey and transfer to Otterbein any and all property inherited by the Elder, up to an amount equal to the total special financial assistance received by the Elder from Otterbein.

"Exhibit C - General Terms & Conditions."

**{¶ 5}** In sum, the Agreement was clear that Douglas was not a guarantor of payment, but he was obligated to use Joan's resources to pay. His duties included a precise obligation: Douglas must direct his mother's resources toward payment for services rendered by Otterbein. Most significantly, the Agreement prohibited him from diverting those resources while any debt to Otterbein remained outstanding.

**{¶ 6}** The path to securing Medicaid coverage for Joan's care proved far from straightforward. From April through October 2021, Douglas engaged with two separate Otterbein Medicaid specialists to navigate the application process. Despite these efforts, with Otterbein serving as Joan's authorized Medicaid representative, two successive applications met with denial.

**{¶ 7}** October 28, 2021, marked a decisive moment in this case. On that date, Douglas, exercising his authority as Joan's attorney-in-fact, sold her home for $82,874.13 in net proceeds. At the time, Joan's outstanding balance at Otterbein stood at $72,416.94. But rather than directing these proceeds toward the outstanding debt, Douglas—acting on the advice of an attorney—placed the funds in a Medicaid pooled trust. This decision reflected his attorney's strategy to preserve Joan's Medicaid eligibility.

**{¶ 8}** The third attempt at securing Medicaid coverage, undertaken with the

assistance of the attorney, finally succeeded. On June 17, 2022, Joan received approval for Medicaid benefits, with coverage retroactive to February 1, 2022. This victory, however, proved incomplete: a substantial gap remained between Joan's admission and the retroactive coverage date, leaving a significant period of private-pay charges unaddressed.

{¶ 9} On May 2, 2022, Otterbein filed suit against three defendants: Joan Carman, Douglas Carman, and The Huntington National Bank in its capacity as trustee of Joan's pooled trust. Otterbein's complaint set forth a series of claims: unjust enrichment against Joan; fraudulent conveyance against both Joan and Huntington; and a trio of claims against Douglas—breach of contract, promissory estoppel, and civil conspiracy. The complaint documented an outstanding balance of $143,282.17. In response, the Carmans filed a counterclaim, asserting violations of Ohio's Consumer Sales Practices Act.

{¶ 10} In June 2023, the parties' filed cross-motions for summary judgment. Otterbein sought judgment on its unjust-enrichment and breach-of-contract claims, while the Carmans moved for summary judgment on all claims, including their counterclaim. Otterbein's requested $79,842.94 in relief from Joan, representing her outstanding balance as of the motion's filing date, and $72,416.94 from Douglas, corresponding to Joan's balance when he directed the home sale proceeds to the trust rather than to Otterbein.

{¶ 11} The trial court rendered its decision on November 3, 2023. It denied the Carmans' motion while granting Otterbein partial summary judgment. The court found Joan had been unjustly enriched by $79,842.94 and that Douglas's breach of the admission agreement had damaged Otterbein to the extent of $72,416.94. While dismissing the promissory estoppel claim against Douglas, the court's ruling vindicated

Otterbein's core theories of recovery. Otterbein then voluntarily dismissed its remaining claims under Civil Rule 41(A). The litigation concluded with two final developments: the court granted Otterbein summary judgment on the Carmans' counterclaim on December 5, 2023, and Huntington was subsequently dismissed from the action.

{¶ 12} The final phase of the litigation began in March 2024, when the trial court's review of proposed judgment entries revealed discrepancies in the damage calculations. This discovery prompted the court to order a hearing before a magistrate to resolve the outstanding questions of damages. The central inquiry: how should payments made after the November 2023 summary-judgment decision affect Otterbein's recovery?

{¶ 13} At the hearing, Brandy Taylor, Otterbein's Director of Revenue Cycle & Patient Accounts, provided crucial testimony about intervening payments. Between Otterbein's summary-judgment motion on June 20, 2023, and the hearing date of March 27, 2024, Otterbein had received and credited $50,287.76 to Joan's account. Taylor stated that these payments substantially reduced the outstanding balances: Joan's liability decreased from $79,842.94 to $29,555.18, while Douglas's exposure dropped from $72,416.94 to $22,129.18. Although the Carmans argued that earlier Medicaid payments, made between October 2021 and June 2023, should further reduce Douglas's liability, the magistrate found they failed to substantiate this claim with evidence. The magistrate accordingly found the reduced figures—$29,555.18 for unjust enrichment and $22,129.18 for breach of contract—represented the proper measure of damages.

{¶ 14} The trial court entered final judgment on July 1, 2024. After overruling the Carmans' objections, it adopted the magistrate's findings and adopted the magistrate's decision. The court imposed joint and several liability, holding Joan and Douglas Carman responsible for $29,555.18 and $22,129.18 respectively, plus statutory interest and costs.

{¶ 15} The Carmans appealed.

## II. Analysis

{¶ 16} The Carmans mount a two-pronged challenge to the trial court's judgment. Their four assignments of error contest both the court's fundamental power to act—questioning its jurisdiction in the wake of Otterbein's voluntary dismissal of select claims—and the substantive foundations of its decision to impose liability on both Joan and Douglas.

### A. Jurisdiction after Otterbein's voluntary dismissal

{¶ 17} The first assignment of error alleges:

{¶ 18} THE TRIAL COURT ERRED IN ENTERING JUDGMENT AGAINST THE APPELLANTS ONCE APPELLEE FILED A CIV.R. 41(A)(1)(A) NOTICE OF DISMISSAL.

{¶ 19} In their first assignment of error, the Carmans present a jurisdictional challenge that strikes at the trial court's authority to enter judgment. Their argument centers on the effect of Otterbein's Civil Rule 41(A)(1)(a) notice dismissing its "remaining claims."

{¶ 20} The controlling precedent comes from the Ohio Supreme Court's decision in *Pattison v. W.W. Grainger, Inc.*, 2008-Ohio-5276. There, the Court spoke with unmistakable clarity: "Civil Rule 41(A) allows for a dismissal of *all claims* against particular defendants," but not the piecemeal dismissal of individual claims. (Emphasis sic.) *Morgan Stanley Dean Witter Commer. Fin. Servs. v. Sutula*, 2010-Ohio-2468, ¶ 3, quoting *Pattison* at ¶ 19-20. The emphasis on "all" defines the rule's scope.

{¶ 21} The chronology here is important. On November 3, 2023, Otterbein secured summary judgment on two claims: unjust enrichment against Joan and breach of contract against Douglas. Seeking to transform this interlocutory ruling into a final, appealable order, Otterbein then filed a notice under Civil Rule 41(A)(1)(a) dismissing its "remaining claims." The trial court's final judgment of July 1, 2024, both memorialized the summary

judgment rulings and dismissed Otterbein's remaining claims with prejudice.

**{¶ 22}** The parties draw sharply different conclusions from these events. The Carmans contend that Otterbein's voluntary dismissal swept away the entire action—including the interlocutory summary judgment rulings. Otterbein counters that its attempted dismissal of individual claims, rather than all claims, was merely a nullity under *Pattison*.

**{¶ 23}** Ohio Civil Rule 41(A)(1)(a) provides that a plaintiff may unilaterally "dismiss all claims asserted by that plaintiff against a defendant" before trial commences. The rule refers to "all claims." Indeed, the Ohio Supreme Court in *Pattison* definitively held that when a plaintiff has secured rulings on some claims—but lacks a final order under Civ.R. 54(B)—that plaintiff cannot manufacture finality by voluntarily dismissing only the remaining claims against the same defendant. *Pattison*, 2008-Ohio-5276 at ¶ 1.

**{¶ 24}** The Carmans invoke *Denham v. New Carlisle*, 86 Ohio St.3d 594, 597 (1999), for the proposition that a Civil Rule 41(A) dismissal "nullifies the action only with respect to those parties dismissed from the suit." But this reliance is misplaced. *Denham*'s teaching is more modest: it simply confirms that dismissing certain defendants leaves claims against other defendants undisturbed.

**{¶ 25}** In this case, Otterbein sought to dismiss only its pending claims while preserving the trial court's summary judgment rulings on breach of contract and unjust enrichment. But as we have explained, such selective dismissal is a legal nullity. *See Welsh Dev. Co., Inc. v. Warren Cty. Regional Planning Comm.*, 2009-Ohio-1158, ¶ 10 (12th Dist.) ("This court considers appellants' attempt to dismiss the remaining claims pursuant to Civ.R. 41[A] to be a nullity, thereby leaving said claims unadjudicated."). The claims Otterbein purported to dismiss remained very much alive until the trial court properly terminated them with prejudice in its final judgment.

**{¶ 26}** We therefore hold that Otterbein's attempted partial dismissal neither stripped the trial court of jurisdiction nor nullified its summary-judgment rulings. The court retained full authority to enter final judgment.

**{¶ 27}** The first assignment of error is overruled.

### B. Douglas's liability for breach of contract

**{¶ 28}** The second assignment of error alleges:

**{¶ 29}** THE TRIAL COURT ERRED IN GRANTING APPELLEE'S MOTION FOR SUMMARY JUDGMENT AND DENYING APPELLANTS' MOTION FOR SUMMARY JUDGMENT ON APPELLEE'S CLAIMS AGAINST APPELLANTS ON BREACH OF CONTRACT AND UNJUST ENRICHMENT.

**{¶ 30}** The Carmans' second assignment of error mounts a multi-faceted challenge to the validity of the Agreement as it relates to Douglas. They contend the Agreement fails as a contract on three grounds: Joan's absence as a signatory, lack of consideration, and violation of the Federal Nursing Home Reform Act. They further argue that genuine issues of material fact exist regarding the capacity in which Douglas signed the Agreement.

**{¶ 31}** This challenge requires us to apply two standards of de novo review. First, in examining the grant of summary judgment, we independently assess the evidence, giving no deference to the trial court's conclusions. *Carter v. Noble*, 2009-Ohio-1010, ¶ 14 (12th Dist.). Summary judgment stands only when the record demonstrates that no genuine issue of material fact remains, the moving party is entitled to judgment as a matter of law, and reasonable minds could reach but one conclusion—adverse to the nonmoving party—when viewing the evidence most favorably to that party. *Welco Industries, Inc. v. Applied Cos.*, 67 Ohio St.3d 344, 346 (1993). Second, we interpret a contract's provisions independently, owing no deference to the trial court's construction.

*Banks v. Heritage Prop. Group, LLC*, 2014-Ohio-991, ¶ 21 (12th Dist.).

1. *That Joan did not sign the Agreement is immaterial.*

{¶ 32} The Carmans first advance a theory that fundamentally misunderstands Douglas's role under the Agreement. They cast him as a guarantor—a derivative party whose liability depends on Joan's primary obligation. From this premise, they reason that Joan's failure to sign the Agreement immunizes Douglas from liability. This argument fails at both a conceptual and practical level.

{¶ 33} The flaw in the Carmans' position lies in their mischaracterization of Douglas's contractual role. A guarantor, by definition, promises to satisfy another's debt upon that person's default. *See Black's Law Dictionary* (12th Ed. 2024) (defining "guarantor" as "[s]omeone who makes a guaranty or gives security for a debt"). But the Agreement crafted a markedly different arrangement: Douglas undertook direct, independent obligations to manage Joan's resources and ensure their proper application to her care costs. Far from guaranteeing her debt, he assumed distinct fiduciary responsibilities—obligations that stand on their own, regardless of Joan's signature on the Agreement. We will elaborate on these duties later in our analysis, but the crucial point here is the independent nature of Douglas's contractual commitments.

{¶ 34} Consequently, Joan's failure to execute the Agreement has no bearing on Douglas's liability for breach of his own contractual obligations.

2. *There is sufficient consideration for Douglas's promises.*

{¶ 35} We next examine whether Douglas's promises to manage his mother's resources, made to secure her admission to Otterbein's care facility, formed an enforceable contract. The Carmans contend these promises lacked consideration, characterizing Douglas's commitments as mere "gratuitous promises" unsupported by any direct benefit to him. Their argument requires us to examine carefully the nature of

consideration in modern contract law.

{¶ 36} The doctrine of consideration demands more nuanced analysis than the Carmans suggest. While consideration requires a "bargained for legal benefit and/or detriment," *Williams v. Ormsby*, 2012-Ohio-690, ¶ 14, we have recognized that consideration may be found without a direct economic exchange, *see FPC Financial. v. Wood*, 2007-Ohio-1098, ¶ 11 (12th Dist.). Indeed, as we observed in *FPC Financial*, consideration may exist without either economic benefit to the promisor or detriment to the promisee. *Id*. The question before us, then, is whether Douglas's promises—though not securing him immediate economic advantage—nonetheless satisfied this flexible standard.

{¶ 37} The Carmans' argument—that Douglas's promises failed for want of direct benefit—fundamentally misapprehends the nature of consideration in contract law. Two established principles illuminate their error.

{¶ 38} First, consideration need not flow directly to the promisor. As we explained in *FPC Financial*, "the benefit of the consideration need not accrue to the promisor." *Id*. The Restatement (Second) of Contracts, which guided our analysis, expressly provides that consideration may move between any combination of parties: "The performance or return promise may be given to the promisor or to some other person. It may be given by the promisee or by some other person." 1 Restatement of the Law 2d, Contracts, § 71(4) (1981). Thus, the fact that Otterbein provided services to Joan rather than Douglas poses no barrier to enforcement. As the Tenth District has aptly observed, consideration is valid whenever it is "bargained for and given in exchange for the promise," regardless of "from whom the consideration moves or to whom it goes." *Carstens v. Vesmont Mgt. Group*, 1996 Ohio App. LEXIS 862, *4-5 (10th Dist. Mar. 5, 1996).

{¶ 39} Second, and more fundamentally, the touchstone of consideration is not

- 11 -

benefit but exchange. The enduring lesson of *Hamer v. Sidway*, 124 N.Y. 538 (1891), illustrates this principle. There, an uncle's promise to pay his nephew for abstaining from certain conduct was held enforceable despite conferring no obvious benefit on the uncle. The decisive factor was not the advantage gained by either party, but rather the bargained-for exchange of promises.

{¶ 40} Applying these principles to the case at hand reveals the presence of valid consideration. The exchange was straightforward: Douglas promised to manage Joan's resources and ensure their availability for payment, while Otterbein committed to provide comprehensive care for Joan. This arrangement bears all the hallmarks of a bargained-for exchange. Otterbein's promise of care did not exist in isolation—it was induced by and predicated upon Douglas's commitments regarding resource management. Similarly, Douglas made his promises precisely to secure Otterbein's services for his mother.

{¶ 41} This mutual exchange stands in sharp contrast to a mere gratuitous promise. Douglas did not simply voice an aspirational intent to pay for his mother's care. Instead, he made specific, binding commitments about resource management that provided the essential foundation for Otterbein's provision of services. The consideration doctrine serves as a crucial dividing line between enforceable contracts and unenforceable expressions of intent. Here, Douglas's promises—concrete, specific, and instrumental to securing his mother's care—fall decisively on the enforceable side of that line.

{¶ 42} We therefore hold that Douglas's promises in the admission agreement rested on valid consideration. The reciprocal exchange of promises between Douglas and Otterbein created binding obligations, irrespective of whether Douglas personally received the services his promises helped secure.

3. *The Agreement did not violate the Federal Nursing Home Reform Act.*

{¶ 43} The Carmans argue that enforcing the Agreement against Douglas violates the Federal Nursing Home Reform Act ("FNHRA" or "Act"). Congress enacted the FNHRA to ensure that nursing homes receiving Medicaid funds "respect and protect their residents' health, safety, and dignity." *Health & Hosp. Corp. v. Talevski*, 599 U.S. 166, 171 (2023). The Carmans' challenge focuses on a specific statutory protection: the FNHRA's prohibition on requiring third-party payment guarantees as a condition for admission or continued residence. They maintain that the Agreement impermissibly transformed Douglas into a guarantor of Joan's debt.

{¶ 44} The statutory framework requires careful analysis. The FNHRA categorically bars nursing facilities from "requir[ing] a third party guarantee of payment" as a prerequisite for admission or continued stay. 42 U.S.C. 1396r(c)(5)(A)(ii). But—and this distinction proves decisive—Congress carved out an important exception to this general prohibition. Facilities may require individuals with "legal access to a resident's income or resources" to enter into contracts for payment from those specific funds. 42 U.S.C. 1396r(c)(5)(B)(ii). This exception comes with a crucial caveat: such arrangements must be structured so that the third party does not "incur[] personal financial liability." *Id*. Both federal and Ohio regulatory frameworks adopt this framework. *See* 42 C.F.R. 483.15(a)(3); Ohio Adm.Code 5160-3-02(C)(4).

{¶ 45} Two Ohio appellate decisions loom large in the Carmans' argument: *Village at the Greene v. Smith*, 2020-Ohio-4088 (2d Dist.), and *Natl. Church Residences First Community Village v. Kessler*, 2023-Ohio-1437 (3d Dist.). These cases addressed the question, under the FNHRA, of when nursing facilities may hold representatives personally liable for residents' expenses. Both decisions considered whether nursing homes are circumventing the FNHRA's prohibition on third-party guarantees by recasting payment obligations as breach-of-contract claims against representatives who managed

residents' funds.

**{¶ 46}** The holdings of these cases crystallize an important principle: absent voluntary assumption of personal liability, nursing facilities cannot impose financial responsibility on representatives merely by characterizing the obligation as a breach of contract rather than a payment guarantee. This distinction, the courts reasoned, would elevate form over substance and undermine FNHRA's protective purpose. We examine both cases more carefully.

*Village at the Greene v. Smith*

**{¶ 47}** *Village at the Greene* presented a conflict between a nursing facility's attempt to secure payment and the FNHRA's protective framework. The facility sued Robert D. Smith, who held power of attorney for his resident elderly father, seeking unpaid care expenses through claims of breach of contract and unjust enrichment. The dispute crystallized around Smith's role in the admission agreement: while he signed as his father's "Representative," he expressly declined to assume personal liability by marking "no" on the personal-guarantee provision. The agreement nonetheless imposed specific obligations on representatives, including requirements to deploy the resident's resources for payment, facilitate Medicaid applications, and—notably—accept personal liability if they failed to navigate the Medicaid process properly.

**{¶ 48}** The facility's theory of liability rested on a subtle distinction: Smith, they argued, faced personal liability not because he guaranteed payment, but because he signed specifically as a "Representative" rather than as power of attorney, and subsequently breached contractual duties regarding fund management and Medicaid compliance. This characterization, Village maintained, created an independent basis for personal liability distinct from any payment guarantee. Smith countered by emphasizing his representative capacity, pointing to his explicit rejection of personal liability, noting his

resignation as power of attorney, and—most fundamentally—invoking federal and Ohio law's prohibition on requiring personal financial responsibility from representatives.

{¶ 49} The Second District's decision in *Smith* affirmed summary judgment in Smith's favor, grounding its analysis in the FNHRA (42 U.S.C. 1396r[c][5][A][ii]), its ]implementing regulations (42 C.F.R. 483.15[a][3]), and Ohio's administrative framework (Adm.Code 5160-3-02[C][4]). The court concluded that nursing facilities cannot accomplish through artful contract drafting what Congress expressly prohibited through FNHRA's guarantee provisions. While facilities may require representatives to manage and direct payment from residents' resources, they cannot—absent voluntary and explicit acceptance—impose personal financial liability on these representatives. Applying this principle, the court struck down as unenforceable the contract provision that would have required Smith to pay from his personal funds for alleged failures in the Medicaid application process. Such provisions, the court concluded, represent precisely the kind of backdoor route to personal liability that FNHRA was designed to prevent.

*National Church Residences First Community Village v. Kessler*

{¶ 50} The Third District confronted similar issues in *National Church Residences First Community Village v. Kessler*, which arose when a nursing facility sought damages for unpaid charges after Rosa McGlone's Medicaid benefits were terminated. The facility's breach-of-contract claim against Kathy Kessler, who had signed the admission agreement as her mother's representative, centered on McGlone's loss of Medicaid eligibility due to excess assets. The parties' positions crystallized familiar themes: Kessler maintained she signed purely in a representative capacity and fulfilled her obligations regarding the Medicaid process, while National Church alleged she breached the agreement by failing to properly manage McGlone's checking account and respond to the Medicaid termination.

**{¶ 51}** The Third District's holding rested on multiple, independent grounds. First, it found a fundamental defect in the facility's theory: Kessler, having signed solely as a representative, lacked contractual privity necessary for breach. Second, even assuming privity existed, the court found no breach of Kessler's contractual obligations. Most significantly, the court reinforced the FNHRA's prohibition on third-party payment guarantees, explicitly adopting Village's reasoning that provisions imposing personal liability on non-consenting representatives violate both federal and Ohio law. *Kessler*, 2023-Ohio-1437, ¶ 39.

**{¶ 52}** The court stated that nursing facilities may require representatives to manage residents' assets but cannot impose personal liability. As the court emphasized, facilities are limited to "request[ing] and requir[ing] the resident's representative (with legal access to the resident's assets) to pay for the resident's care with such assets (*without* incurring personal-financial responsibility)." (Emphasis sic.) *Id.* at ¶ 41. The court indicated that its interpretation aligned with other jurisdictions' recognition that Congress intended to protect family members from assuming personal financial responsibility, citing *Inova Health Sys. Servs. v. Bainbridge*, 81 Va.Cir. 39, 44 (Cir.Ct.2010) ("It is clear from language in 42 USCS § 1396r that Congress did not want nursing homes to force others not in privity, such as a resident's family member, to assume personal financial responsibility for the care of the resident.").

**{¶ 53}** The decision established two crucial principles: representatives who do not explicitly assume personal liability cannot be held personally responsible, and nursing facilities cannot evade the FNHRA's protections through contractual cooperation clauses. These holdings led the court to reverse summary judgment for *National Church*, emphasizing both the privity barrier and the illegality of provisions attempting to impose personal liability on representatives.

{¶ 54} Yet the interpretation of these two Ohio courts is not universal. Courts in other jurisdictions have charted a different course. These courts read the FNHRA to permit nursing homes to create enforceable contracts requiring proper asset management without transgressing the prohibition on third-party guarantees. Their decisions warrant careful examination, as they illuminate the distinction between prohibited personal guarantees and permissible asset management obligations.

*Sunrise Healthcare Corp. v. Azarigian*

{¶ 55} *Sunrise Healthcare Corp. v. Azarigian*, 76 Conn.App. 800 (2003), presents a nuanced application of the FNHRA's guarantee provisions. The dispute emerged when Vicki M. Azarigian, who held power of attorney for her mother Gloria Wood and signed the admission agreement as a "responsible party," ceased payments to the nursing facility. Before stopping payments, Azarigian had transferred funds from Wood's accounts and allocated substantial resources to a private companion. These decisions proved consequential when Wood's Medicaid application was denied due to these asset transfers, prompting Sunrise's breach of contract action.

{¶ 56} Azarigian's defense centered on two propositions: first, that the agreement violated the FNHRA's prohibition on third-party payment guarantees under 42 U.S.C. 1396r(c), and second, that her power of attorney status shielded her from personal liability. The Connecticut appellate court's rejection of these arguments illuminates the distinction between prohibited guarantees and permissible asset management obligations.

{¶ 57} The court's analysis turned on the agreement's precise language, which explicitly disclaimed any requirement that the responsible party "personally guarantee or serve as surety for payment." This provision distinguished the case from those where courts invalidated contracts explicitly demanding personal liability. Critically, the court

found that while Azarigian initially acted as Wood's agent in executing the contract, her separate signature as "responsible party" created distinct obligations beyond her power of attorney role—specifically, duties regarding the management of Wood's assets.

{¶ 58} The *Sunrise* court articulated a framework for understanding representative liability. The agreement's prohibition on personal liability for payments from the resident's account, coupled with its requirement that the responsible party use only the resident's assets for payment, created what the court described as a trustee-like relationship: "The defendant is liable only for her handling of Wood's assets and only to the extent that Wood's assets would cover outstanding payments owed to the plaintiff." *Sunrise*, 76 Conn.App. at 808. This analogy to trust law is illuminating: "The defendant's potential liability under the contract for an unauthorized use of Wood's assets is analogous to a trustee's liability for an unauthorized use of trust property. Just as the defendant is bound by the terms of the contract, so a trustee must act in accordance with the terms of the trust instrument." *Id.* at 809.

{¶ 59} The court thus drew a crucial distinction: Azarigian faced liability not for guaranteeing her mother's debt, but for breaching her contractual duties in managing her mother's assets. The damages flowed not from personal guarantee of payment but from the misapplication of funds that should have been available for care. This framework, the court concluded, satisfied the FNHRA's prohibition on personal guarantees while preserving nursing facilities' ability to ensure proper management of resident resources.

*Meadowbrook Center, Inc. v. Buchman*

{¶ 60} *Meadowbrook Ctr., Inc. v. Buchman*, 149 Conn.App. 177 (2014), further illuminates the distinction between prohibited payment guarantees and permissible contractual obligations under the FNHRA. The dispute arose when Robert Buchman, who signed as "responsible party" for his mother's care, failed to provide necessary

information for her Medicaid application. Meadowbrook pursued both breach of contract and promissory estoppel claims, seeking damages equivalent to the Medicaid payments that would have been received had benefits been approved.

{¶ 61} While the appellate court ultimately reversed the trial court's judgment for Meadowbrook on causation grounds, its analysis of personal liability under nursing home admission agreements proves instructive.[2] The court systematically dismantled Buchman's contention that personal liability could attach only when a representative received transferred assets from the resident. Instead, the court articulated a more nuanced interpretation of the FNHRA's scope: while 42 U.S.C. 1396r prohibited requiring third-party guarantees as an admission condition, it did not foreclose voluntary assumption of specific contractual duties. As the court explained, "federal law prohibited the plaintiff from requiring, as a prerequisite to admission, that the defendant guarantee all of the debts incurred by his mother. At the same time, federal law did not proscribe the defendant's voluntary election to undertake certain specific contractual obligations, thereby exposing himself to liability for his failure to comply therewith." (Citations omitted.) *Meadowbrook* at 201.

{¶ 62} This distinction proves crucial: the FNHRA did not create a blanket prohibition on third-party guarantees but rather targeted mandatory debt payment guarantees specifically. Under the court's reading, the agreement properly made Buchman liable for failing to perform non-payment obligations, including his duty to facilitate Medicaid applications.

{¶ 63} The court's interpretive approach rested on fundamental contract principles.

---

2. This section of the opinion (Section III) was dicta, which the court acknowledged. The concurring judge in the case decided the personal-liability issue, and the majority felt obligated to address it to prevent the concurrence's analysis from potentially misleading future cases. The legal analysis set forth in the concurring opinion, said the majority, was "contrary to several well reasoned decisions" of Connecticut trial courts as well as the decisions of courts in other jurisdictions. *Meadowbrook* at 198.

Eschewing constructions that would render contractual provisions meaningless, the court observed that "'the law of contract interpretation . . . militates against interpreting a contract in a way that renders a provision superfluous.'" *Meadowbrook*, 149 Conn.App. at 204, quoting *Assn. Res. v. Wall*, 298 Conn. 145, 183 (2010). A finding of complete immunity from liability would effectively "read these provisions out of the agreement." *Id.* at 209.

**{¶ 64}** Like *Sunrise*, *Meadowbrook* carefully distinguished between prohibited guarantor liability and permissible liability for breaching specific, voluntarily assumed obligations. The court emphasized that agreeing to assist with Medicaid applications constitutes a commitment to facilitate payment, not a guarantee to pay costs personally. Had Congress intended broader immunity, the court reasoned, it would have employed more expansive language. Instead, the FNHRA's text specifically targeted payment guarantees while preserving other contractual obligations. As the court concluded, "finding the defendant liable for breach of contract for failing to perform obligations he voluntarily undertook as a signatory to the agreement is not the same as making him a guarantor for his mother's care under *all* circumstances." (Emphasis sic.) *Id.* at 211.

*Pine Brook Care Center v. D'Alessandro*

**{¶ 65}** *Pine Brook Care Ctr. v. D'Alessandro*, 2020 N.J. Super. Unpub. LEXIS 2258 (Super.App.Div. Nov. 23, 2020), completes the trilogy of cases defining the contours of the FNHRA's guarantee provisions. The dispute originated when Pine Brook pursued Michael D'Alessandro's three daughters—his court-appointed guardians—for unpaid care costs. The daughters signed various agreements upon Michael's admission as a private-pay resident. While they explicitly declined to personally guarantee payment in the payor agreement, the daughters did promise to timely pursue Medicaid benefits and to properly deploy Michael's assets for his care. Pine Brook's complaint encompassed 13 causes of

action, ranging from detrimental reliance and breach of contract to interference with contractual relations and breach of fiduciary duty. The facility alleged the daughters failed both to timely pursue Medicaid benefits and to properly deploy Michael's assets for his care. One daughter filed a counterclaim alleging that Pine Brook's attempt to impose liability on her violated the FNHRA.

{¶ 66} The trial court, interpreting New Jersey's Nursing Home Act ("NHA"), N.J.S.A. 30:13-3.1(a)(2)—a statute that parallels the FNHRA's protections—granted summary judgment to the daughters.[3] The court read the NHA as creating a broad prohibition against imposing personal liability on third parties for residents' care costs. The appellate court reversed, concluding the trial court's interpretation of the statute was too broad. Through close textual analysis, the appellate court determined that both the NHA and the FNHRA prohibited only payment guarantees as admission conditions: "The statute prohibits nothing else." *Pine Brook* at *26-27. While facilities could require individuals with legal access to resident assets to manage those funds without personal liability, neither statute conferred blanket immunity from liability arising from other contractual or tortious conduct.

{¶ 67} Echoing *Meadowbrook*, the court rejected the argument that the phrase

---

3. N.J.S.A. 30:13-3.1(a)(2) pertinently provided:

"A nursing home shall not, with respect to an applicant for admission or a resident of the facility:

". . .

"(2) require a third[-]party guarantee of payment to the facility as a condition of admission or expedited admission to, or continued residence in, that facility; except that when an individual has legal access to a resident's income or resources available to pay for facility care pursuant to a durable power of attorney, order of guardianship or other valid document, the facility may require the individual to sign a contract to provide payment to the facility from the resident's income or resources without incurring personal financial liability."

*Pine Brook* at *21-22.

"without incurring personal financial liability" created comprehensive immunity:

> [I]f the Legislature intended to grant the broad immunity from personal liability [that] the [trial] court found, and which defendants urge, it would have done so more clearly and directly. Instead, the plain and unambiguous language of the exception . . . simply means an individual may be required to agree "to provide payment to the facility from the resident's income or resources," but, by doing so, the individual does not become personally liable—or guarantee payment of—the sums due for the resident's care.

*Pine Brook* at *28-29. The court's reasoning emphasized legislative precision: "We may assume because the Legislature chose to specifically identify the proscribed condition— required guarantees of payment—it did not intend to prohibit a nursing home from requiring that a third party agree to other obligations . . . ." *Id.* at *27.

**{¶ 68}** The court's analysis aligned with *Sunrise* and *Meadowbrook* in distinguishing between prohibited payment guarantees and permissible contractual obligations. Particularly instructive was its characterization of the promise to pursue Medicaid benefits: "An agreement to apply for Medicaid benefits is just that—a commitment to assist the resident in obtaining Medicaid benefits so those benefits pay for his or her care. A failure to honor that commitment does not convert an agreement to apply for Medicaid benefits into a guarantee of payment . . . ." *Pine Brook*, 2020 N.J. Super. Unpub. LEXIS 2258, at *33. This distinction reinforced the principle that while nursing homes cannot mandate third-party payment guarantees, they retain the ability to pursue other claims against third parties related to resident care.

*Inova Health Sys. Servs. v. Bainbridge*

**{¶ 69}** The Virginia Circuit Court charted a markedly different course in *Inova Health Sys. Servs. v. Bainbridge*, 81 Va.Cir. 39 (Cir.Ct.2010), the case cited approvingly in *Kessler*. The dispute arose when Inova sought to recover unpaid care costs from Susan Bainbridge, who served both as power of attorney ("POA") for Betty Callicotte-Meier and

as "Responsible Party" on the facility's admission agreement. Inova's theory of liability rested on the premise that Bainbridge, by signing as Responsible Party despite her POA status, personally undertook contractual obligations. The facility alleged she had misappropriated Callicotte-Meier's funds and failed to secure Medicaid coverage. Bainbridge maintained her signature reflected only her agency role.

{¶ 70} The court's analysis proceeded along two distinct but complementary paths. First, applying Virginia agency-law principles, the court emphasized that agents who disclose their principal and act within their authority's scope avoid personal liability. Bainbridge's signing clearly occurred in her capacity as Callicotte-Meier's disclosed agent. Second, and more fundamentally, the court read the FNHRA (42 U.S.C. 1396r) as creating a categorical prohibition against requiring third-party payment guarantees, explicitly permitting individuals to execute admission agreements "without incurring personal financial liability."

{¶ 71} The Virginia court explicitly rejected *Sunrise*'s reasoning, which had sanctioned personal liability for POAs signing as "Responsible Parties." This interpretation, the court concluded, failed to recognize that pursuing payment from personal assets constitutes personal liability regardless of prior access to resident funds. The court characterized *Sunrise* as improperly "attempting to create a remedy where none exists." *Inova* at 45. Central to the court's reasoning was Congress's explicit qualification in 42 U.S.C. 1396r(c)(5)(B)(ii) that facilities could require signatures from individuals with access to residents' funds only if they did so "without incurring personal financial liability." Any construction permitting personal liability, the court concluded, would fundamentally conflict with federal law's protective purpose:

> Although it may seem unusual that Congress would allow a nursing home to require an individual to sign an admission agreement but not give the nursing home recourse if that

> individual failed to make payments, it is not for this Court to create such a remedy. If Congress wanted to create a remedy, it could have done so expressly, and if that were the case, Congress certainly would not have included the express language "without incurring personal liability."

*Inova* at 45-46.

*Analysis of the law*

**{¶ 72}** We think that the better-reasoned approach emerges from *Sunrise*, *Meadowbrook*, and *Pine Brook*. While *Village* and *Kessler* reach different conclusions, those cases are readily distinguishable, as they involved contract provisions explicitly requiring representatives to pay charges from their own resources—language notably absent from the admission agreement before us. More fundamentally, we think those decisions rest on a misreading of the FNHRA, conflating two distinct concepts: guarantor liability and responsible party obligations.

**{¶ 73}** The distinction between prohibited payment guarantees and permissible asset management obligations is nuanced but important. A guarantee, as Black's Law Dictionary tells us, is "the assurance that a contract or legal act will be duly carried out"—essentially, a promise to serve as financial backup. *Black's Law Dictionary* (12th Ed. 2024). The FNHRA's text forbids nursing homes from demanding such guarantees or conditioning admission upon them. But crucially, the Act expressly permits facilities to require those who control a resident's finances to use those specific resources for care. Think of it this way: A nursing home cannot require a resident's son to promise "I will pay my mother's bills if she cannot." That's a guarantee, plain and simple. But it can require that same son, as someone with access to his mother's funds, to agree "I will use my mother's funds to pay for her care." The first creates personal liability; the second ensures proper management of the resident's own resources.

**{¶ 74}** This reading maintains a careful balance. The FNHRA protects family

members from being strongarmed into personal guarantees while ensuring nursing homes can secure practical mechanisms to access payment from residents' existing resources. Nothing in the Act suggests Congress meant to grant representatives broad immunity from all forms of personal liability. Instead, Congress took aim at a specific practice: requiring payment guarantees as a condition of admission or continued stay.

{¶ 75} When the Act speaks of "without incurring personal financial liability," context matters. This phrase bars agreements that create personal liability for the resident's debts. But it does not—indeed, cannot—immunize individuals who breach their own contractual obligations. When someone agrees to manage a resident's resources and fails to do so, their liability stems not from the underlying bills but from their own breach. A contrary reading would render the Act's resource management provisions toothless—nursing facilities could require such agreements but would stand powerless when they were violated.

{¶ 76} This interpretation flows naturally from the FNHRA's text and purpose. The Act speaks directly to nursing facilities, circumscribing what they may require. It says nothing about granting representatives immunity—that's simply not what Congress was addressing. The Act focuses on admission requirements, not blanket liability shields. We too think that had Congress intended such sweeping protection, it would have said so clearly. Instead, it struck a careful balance: no required guarantees, but yes to resource management agreements with real teeth.

{¶ 77} The principle, then, is straightforward: "The statute provides only that a nursing home may not require a third-party guarantee of payment as a condition of admission or continued residence." *Pine Brook*, 2020 N.J. Super. Unpub. LEXIS 2258, at *29. The FNHRA bars required payment guarantees—nothing more. Third parties remain accountable for breaching their voluntary contractual duties, even when that breach

results in unpaid bills. This reading honors both the Act's text and Congress's careful design.

*Application to the facts*

**{¶ 78}** The admission agreement before us complies with statutory requirements. Paragraph B2 leaves no room for doubt: "The Representative is not personally guaranteeing payment to Otterbein, and nothing in this Agreement is to be construed as a personal guarantee of payment." Rather than imposing guarantor obligations, the Agreement establishes specific duties tied to the management of resident resources:

> All payment obligations refer to payment from the Resident's Resources (as defined below). All financial obligations in this Agreement are the Resident's; however, You have asserted to Otterbein that the Representative shall act in a fiduciary capacity on the Resident's behalf to satisfy the Resident's financial obligations under this Agreement, and the Representative agrees to act in such a fiduciary capacity. The Representative agrees to pay Otterbein from the Resident's Resources for services provided to the Resident.

This arrangement mirrors the one we tacitly endorsed in *Vesper v. Lebanon*, 2021-Ohio-4545 (12th Dist.). There, we acknowledged that while federal and state law bar required payment guarantees, they "do not prohibit a nursing facility from requiring third parties who have access to the resident's funds from entering into a contract requiring payment by the third party from the resident's funds." *Id.* at ¶ 3, fn. 1. That distinction proves decisive here.

**{¶ 79}** When Douglas signed the Agreement as Joan's "Representative," he accepted specific responsibilities regarding her resources—responsibilities that fall squarely within what the FNHRA permits nursing homes to require. While the Act shields Douglas from personal liability for his mother's expenses in general, it provides no sanctuary from liability for breaching his own contractual commitments. Congress knew how to craft immunity provisions when it wanted to. Here, it chose a more calibrated

approach: protecting families from guarantee requirements while preserving nursing homes' ability to secure proper management of resident resources. This reading reflects the practical reality that most nursing home residents rely on others to handle their financial affairs.

{¶ 80} Douglas's liability flows directly from his decision to divert proceeds from Joan's home sale into a trust rather than applying them to her unpaid balance. This liability stems not from any guarantee of Joan's debt—which would be impermissible—but from his failure to fulfill his specific duties regarding those proceeds. Had he applied the funds toward her care and found them insufficient, he would face no liability. That the damages equal Joan's unpaid balance reflects not guarantor liability but the natural consequences of his breach.

{¶ 81} In sum, neither federal nor Ohio law bars nursing homes from enforcing focused resource-management obligations like those contained in the admission agreement here. While Douglas cannot be compelled to guarantee Joan's care from his personal funds, he remains accountable for his failure to manage her resources as promised. This framework advances the dual objectives of protecting families from guarantor obligations while ensuring nursing homes can secure payment from legitimate resident resources through proper financial management.

4. *Douglas's signing capacity.*

{¶ 82} We reject the Carmans' final argument that genuine issues of material fact exist regarding the capacity in which Douglas signed the agreement. The evidence and contractual language decisively resolve this issue.

{¶ 83} The admission agreement establishes two distinct roles for Douglas: fiduciary for Joan and individual signatory for himself. As "Representative," Douglas made specific commitments about managing Joan's resources—commitments that, by their

nature and the Agreement's structure, he undertook in his individual capacity. That Douglas held power of attorney for Joan does not alter this fundamental arrangement. Indeed, the Agreement's careful drafting illuminates the distinction: while explicitly disclaiming Douglas's personal guarantee of payment, it simultaneously binds him to specific resource-management obligations.

{¶ 84} The Carmans' contrary arguments are not convincing. They point to Douglas's use of "POA" on other documents and his subjective intent to avoid personal liability. But these considerations cannot overcome the Agreement's plain terms. As the Ohio Supreme Court has said, clear contractual language prevails over undisclosed intentions. *See Beverage Holdings, LLC v. 5701 Lombardo, LLC*, 2019-Ohio-4716, ¶ 13. Here, the Agreement unambiguously bound Douglas, as "Representative," to specific promises about managing Joan's resources. His subsequent decision to redirect sale proceeds to a trust breached these promises, regardless of his power-of-attorney status.

{¶ 85} At root, Douglas's position reflects a fundamental misunderstanding of the Agreement's structure. The contract crafts a careful balance: while shielding Douglas from personal liability for Joan's debt, it imposes specific, enforceable obligations regarding the management of her resources. Holding Douglas liable for breaching these management obligations does not transform him into a guarantor of Joan's debt. Otterbein seeks not to hold Douglas personally liable for Joan's debts, but rather to hold him accountable for his own breach of explicit contractual promises.

{¶ 86} The trial court's grant of summary judgment to Otterbein on the breach-of-contract claim must therefore stand. Douglas has neither contested that his redirection of Joan's resources breached the Agreement nor demonstrated that fulfilling his obligations would have required him to assume personal financial liability. Accordingly, we proceed on the settled premise that Douglas breached the Agreement and may be held personally

liable for the resulting damages.

{¶ 87} The second assignment of error is overruled.

**C. Damages for breach of the Agreement**

{¶ 88} The third assignment of error alleges:

{¶ 89} THE TRIAL COURT ERRED IN AWARDING DAMAGES AS A MATTER OF LAW.

{¶ 90} The Carmans contend in the third assignment of error that the trial court erred in its assessment of damages flowing from Douglas's breach of the Agreement. Their challenge presents three distinct claims: first, that the court failed to apply the fundamental principle that contract damages should restore the injured party—here, Otterbein—to its rightful position; second, that the court overlooked certain payments made toward Joan's account that should have offset Douglas's liability; and third, that the court improperly excluded evidence of Medicaid reimbursement rates, which the Carmans maintain was relevant to the damages calculation.

1. *The trial court used the proper measure of damages.*

{¶ 91} The Carmans' first argument challenges the trial court's approach to measuring damages. They assert that the court's award transgresses a bedrock principle of contract law: that damages must place the non-breaching party in the position it would have occupied but for the breach. *See Baird v. Crop Prod. Servs.*, 2012-Ohio-4022, ¶ 24 (12th Dist.). This compensatory principle cabins damages to actual, proven losses. *Id.* Put simply, when a party breaches a contract, damages must make the non-breaching party whole—no more, no less.

{¶ 92} We do not understand the Carmans' theory as to how the awarded damages supposedly bestow a windfall on Otterbein. The Agreement did not obligate Douglas to guarantee the entirety of Joan's debt. Instead, it imposed a precise obligation: to direct

- 29 -

Joan's available resources toward her outstanding balance. Douglas breached this duty when he diverted $72,416.94 from the home sale proceeds to the trust, rather than applying those funds to the balance then due. This diversion deprived Otterbein of funds it would have received had Douglas honored his contractual commitment.

{¶ 93} The trial court properly anchored its damages calculation in this deprivation, measuring the difference between what Otterbein would have received through performance and what it actually received following the breach. While the court's award of $22,129.18—after accounting for subsequent payments—reflects this expectation-based approach, our analysis reveals that this figure may actually undercompensate Otterbein, as we explain below.

2. *The court properly credited payments made between October 2021 and June 2023.*

{¶ 94} The Carmans' second argument concerns the treatment of payments made on Joan's account between October 2021 and June 2023—payments that indisputably totaled $22,228.50. While the trial court credited these payments against Joan's liability, it declined to apply them to reduce Douglas's damages obligation.

{¶ 95} Where damages stem from unpaid monetary obligations, subsequent payments must offset the damage award to prevent double recovery. This principle carries particular force here, as Otterbein seeks only to recover the outstanding balance on Joan's account. At the damages hearing, Otterbein's counsel expressly disavowed any intention to collect twice:

> Otterbein is not seeking to collect the 29,000 from Joan Carman and 22,000 from Mr. Carman, independently. Join[t] and several liability, basically as I understand it, is that 29,555.18 is due and owing Otterbein on the account for Ms. Carman. If Ms. Carman were to pay 29,515.18, that would also satisfy the obligation that's due and owing from Douglas Carman. If $22,129.18 were received by Otterbein today, Douglas Carman's judgment would be satisfied or liability would be satisfied with about $2,000 remaining towards Mrs.

Carman. So, we're not looking to collect two difference balances here, just for clarification purposes.

The joint and several character of Douglas and Joan's overlapping liability demonstrates that these payments serve to satisfy a single underlying debt.

{¶ 96} The trial court's November 3, 2023 decision reached two critical conclusions: Joan had been unjustly enriched by $79,842.94 (the balance at summary judgment), and Otterbein suffered expectation damages of $72,416.94 from Douglas's breach (the balance when he diverted the sale proceeds). Following the damages hearing, the magistrate reduced both figures by $50,287.76—reflecting payments made between June 21, 2023 and March 27, 2024—yielding $29,555.18 for Joan's unjust enrichment and $22,129.18 for Douglas's breach.

{¶ 97} This mathematical approach, though superficially appealing, misapprehends the nature of the obligations at issue. While the $22,228.50 in payments reduced Joan's account balance to $79,842.94 by June 30, 2023, these payments did not diminish Douglas's liability because the balance remained above the amount owed at the time of his breach ($72,416.94). Had Douglas performed as required, a balance of $7,426 would still have been owing.

{¶ 98} Consequently, the trial court exhibited undue generosity in reducing Douglas's obligation by the full $50,287.76 in subsequent payments. The proper reduction should have been $42,861.76 ($50,287.76 less $7,426). Once the account balance fell below $72,416.94, Douglas's liability should have remained fixed at the full amount due, as no balance would have existed at that point had he properly applied the sale proceeds.

{¶ 99} The record establishes that as of March 27, 2024, Otterbein was owed $29,555.18—an amount representing both Joan's unjust enrichment and Otterbein's damages from Douglas's breach. Had Douglas fulfilled his contractual obligation by

remitting the $72,416.94 owed when he diverted the sale proceeds, Joan would have owed nothing on March 27, 2024. In our view, the trial court's damage award actually understates Douglas's liability.

3. *The court reasonably excluded evidence of Medicaid reimbursement rates.*

{¶ 100} We turn finally to the Carmans' contention that the trial court erred in excluding evidence of Medicaid reimbursement rates from its damages calculation. Their theory posits that because Otterbein's claim against Joan sounds in unjust enrichment, the court was obligated to determine the reasonable value of Otterbein's services—a determination that, they argue, must necessarily consider Medicaid reimbursement rates.

{¶ 101} The Ohio Rules of Evidence establish that "all relevant evidence is admissible." Evid.R. 402. Evidence is deemed relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. While the Carmans correctly observe that insurance reimbursement rates may constitute relevant evidence of reasonable value in certain contexts, *see Robinson v. Bates*, 2006-Ohio-6362, ¶ 17, this is not one of them.

{¶ 102} The Medicaid reimbursement rates the Carmans seek to introduce lack relevance to the period at issue. Such rates become material only after a resident establishes program eligibility—a status Joan had not yet achieved during the timeframe in question. Before Medicaid qualification, Otterbein retained the right to charge its standard private-pay rates. The mere possibility that a resident might subsequently qualify for Medicaid cannot retroactively transmute the reasonable value of services into the program's reimbursement rate. Indeed, the Ohio Administrative Code explicitly contemplates this distinction, permitting nursing facilities to charge private-pay rates to residents with pending Medicaid applications. *See* Admin.Code 5160-3-02(C)(3). The trial

court therefore properly anchored its analysis in the actual rates charged during the relevant period.

{¶ 103} The third assignment of error is overruled.

### D. The Ohio Consumer Sales Practices Act

{¶ 104} The fourth assignment of error alleges:

{¶ 105} THE TRIAL COURT ERRED IN GRANTING APPELLEE'S MOTION FOR SUMMARY JUDGMENT DISMISSING APPELLANTS' COUNTERCLAIMS.

{¶ 106} The Carmans' fourth assignment of error—challenging the trial court's dismissal of their Ohio Consumer Sales Practices Act ("CSPA") counterclaim—fails to convince us too.

{¶ 107} The CSPA prohibits a "supplier" from engaging in unfair, deceptive, or unconscionable practices in a "consumer transaction" with a "consumer." R.C. 1345.02(A), 1345.03(A). *See also* R.C. 1345.01(A) (defining "consumer transaction"); R.C. 1345.01(C) (defining "supplier"); R.C. 1345.01(D) (defining "consumer"). The Act provides specific examples of prohibited practices. Unfair or deceptive practices typically involve misrepresentations about the product itself—false claims about quality, unnecessary repairs, that sort of thing. R.C. 1345.02(B)(2), (3), (7). Unconscionable acts, by contrast, occur when suppliers exploit consumers' vulnerabilities, taking advantage of physical, mental, or knowledge-based limitations that prevent consumers from protecting their interests. R.C. 1345.03(B)(1). The Ohio Supreme Court has explained this distinction: deceptive practices mislead about the product, unconscionable acts manipulate understanding of the transaction. *Johnson v. Microsoft Corp.*, 2005-Ohio-4985, ¶ 24.

{¶ 108} Importantly, the CSPA's protective reach extends beyond the moment of purchase, encompassing conduct before, during, and after the transaction—including

related debt collection activities. *Vesper v. Otterbein Lebanon*, 2021-Ohio-4545, ¶ 27 (12th Dist.). And residential care facilities like Otterbein qualify as "suppliers" under the Act. *Id.* at ¶ 28, fn. 5. For purposes of our analysis, we'll assume both Joan and Douglas Carman meet the statutory definition of "consumers" engaged in a covered transaction. *See id.* at ¶ 28 (making the same assumption about the parties in that case).

{¶ 109}  The Carmans' CSPA claim rests on four bases. They allege Otterbein: (1) manipulated Douglas's understanding of the admission agreement; (2) improperly sought payment from him individually; (3) sued on a "non-existent" contract; and (4) pursued excessive remedies. None of these contentions holds water.

{¶ 110}  Start with the manipulation claim. The record reveals no sleight of hand in Otterbein's presentation of the admission agreement. Indeed, the Agreement speaks with crystal clarity: Douglas bore no personal guarantee obligation; his duty extended only to managing Joan's resources. That he now wishes he hadn't signed doesn't transform a straightforward transaction into a deceptive one.

{¶ 111}  The billing practices claim fares no better. Contrary to the Carmans' characterization, Otterbein directed statements to Douglas not because it sought his personal assets, but because he controlled access to Joan's resources—the very funds he agreed to manage for her care. Both the Agreement and invoices maintained this crucial distinction between personal and fiduciary obligations.

{¶ 112}  As for the "non-existent contract" argument, this merely repackages the contract formation claims we have already rejected. But even if we hadn't, pursuing a colorable contract claim—even one that ultimately fails—does not amount to consumer deception under the CSPA. *Vesper*, 2021-Ohio-4545 at ¶ 32.

{¶ 113}  Finally, consider the allegedly excessive remedies. Otterbein's pursuit of 18% interest and attorney fees flowed directly from the Agreement's terms. (The

admission agreement contained a provision for interest accruing at the rate of 1.5% per month—or 18% annually—and provided for the collection of attorney fees if Otterbein had to resort to collection efforts.) Accordingly, "Otterbein's request for contractual interest and attorney fees was not groundless and was colorable." *Id.* at ¶ 42 (similar provision). Its request for punitive damages on the civil conspiracy claim (since dismissed) found explicit authorization in R.C. 2315.21. *See Williams v. Aetna Fin. Co.*, 83 Ohio St.3d 464, 478 (1998). While Otterbein might not have ultimately secured these remedies, merely requesting them—with colorable legal basis—falls well short of a CSPA violation. *See Vesper* at ¶ 43.

**{¶ 114}** In sum, the Carmans have failed to identify any genuine issues of material fact regarding their CSPA counterclaim. While the Carmans' obviously disagree with Otterbein's litigation strategy, such disagreement does not transform routine legal advocacy into unfair, deceptive, or unconscionable conduct under the CSPA. The trial court did not err in granting summary judgment on the CSPA counterclaim.

**{¶ 115}** The fourth assignment of error is overruled.

### III. Conclusion

**{¶ 116}** We have overruled each of the assignments of error presented. The trial court's judgment is therefore affirmed.

BYRNE, P.J., and PIPER, J., concur.