[Cite as *In re Estate of Ingalls*, 2026-Ohio-69.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

|  |  |  |
|---|---|---|
| IN RE: | : | CASE NO. CA2025-03-031 |
| ESTATE OF SEAN THOMAS INGALLS | : | |
| | : | OPINION AND JUDGMENT ENTRY 1/12/2026 |
| | : | |
| | : | |
| | : | |

APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
PROBATE DIVISION
Case No. PE23-03-0298

Lyon & Lyons Co. L.P.A., and Robert H. Lyons and Kara H. Lyons, for appellee.

Flowers & Grube, and Paul W. Flowers and Kendra N. Davitt; and Foos & Lentz LLP, and
Cassandra A. Rice, for appellant.

# **O P I N I O N**

**SIEBERT, J.**

{¶ 1} Appellant, Pamela Ingalls, appeals from a decision of the Butler County

Court of Common Pleas, Probate Division ("Probate Court"), distributing the net proceeds

of the settlement of a wrongful death claim related to the death of her son, Sean Ingalls.

Pamela challenges the Probate Court's distribution to Sean's father, Vince Ingalls. Because the Probate Court had exceptionally broad discretion to determine the equitable distribution of the proceeds, and it did not act in a way that was unreasonable, arbitrary, or unconscionable under current Ohio law, we find the award did not amount to an abuse of discretion. We affirm.

## I. Factual and Procedural History[1]

## A. Sean's Accident and Procedural Background

{¶ 2} Sean Ingalls, a 19-year-old young man, full of promise and dreams, enlisted to serve this country in the U.S. Army. On July 23, 2022, he was driving home from an Army base in Kentucky to visit Pamela when he was struck by a semi-truck. The semi didn't stop right away, instead pushing Sean's car into another semi that was illegally parked along the side of the interstate. Sean died instantly in the resulting collision. Sean was the only child of Pamela and Vince and was survived by both parents and two half-sisters, Jillian and Jia, then ages 14 and 12. Following the accident, Pamela filed a wrongful death suit against the trucking companies involved in Sean's accident. Pamela eventually settled the wrongful death suit.

{¶ 3} Pamela, acting as the administrator of Sean's estate, filed an application seeking approval of a settlement and distribution of wrongful death and survival claims totaling $2,396,600. After deducting attorney fees and expenses, $1,578,008.26

---

1. Following the parties' initial briefing, this court could not reconcile the statement of facts asserted in Vince's Appellee Brief with the record before it. We ordered Vince to submit corrected citations to the record or provide this court with an explanation of why he could not do so. Vince substantially complied with this order, correcting most citations to references from the hearing and providing an explanation as to why certain previously referenced facts could not be supported by the record before the Probate Court. Pamela filed a motion to strike Vince's corrections and attached exhibits thereto, as she contended the corrections still contained facts outside of the record. This court was disappointed to find that several of Vince's corrected citations still contained "embellishments" or "exaggerations" of what the record supported. We deny Pamela's motion to strike but note that we have not relied upon any of the facts we found to be embellished or exaggerated in reaching this decision. This opinion only relies upon facts properly before it and supported by the record on appeal.

remained for distribution. The Probate Court determined that these funds constituted wrongful death proceeds, which do not pass under the statute of descent and distribution but are instead allocated among the decedent's eligible next of kin.

{¶ 4}   On January 8, 2025, the Probate Court held a hearing to determine the final distribution of the proceeds.

### B. Hearing Testimony

{¶ 5}   The Probate Court heard testimony from multiple witnesses, including Pamela, Vince, Jennifer Cinnamon, Vince's ex-wife and Sean's stepmother, Beverly Alconero, Pamela's close friend, and Michael Mattina, Vince's acquaintance.

{¶ 6}   The testimony revealed that Pamela shared a significantly closer relationship with Sean than Vince. Sean was born on June 13, 2003, and lived with both parents until 2005, when Pamela obtained a civil protection order ("CPO") against Vince following an incident of physical assault. Although Vince retained visitation rights under that order, the parties divorced, with Pamela receiving primary custody and Vince continuing to have visitation privileges.

{¶ 7}   Pamela testified regarding the profound loss she suffered because of Sean's death. She described the exceptionally close bond she shared with Sean and testified about his resilience despite the abuse he both witnessed and endured at the hands of Vince. Pamela testified that her "entire life revolved around that kid, and he was the most important thing to me in the world, so I just wanted you to know that when he was taken from me, that—that was like a part of me, because we were that close." Pamela further explained that Sean contacted Vince at the direction of his military superiors but continued to express serious reservations about Vince to her and discomfort with the possibility of meeting him in person.

{¶ 8} Pamela called two witnesses who provided corroboration of Pamela's testimony and additional context regarding Sean's relationships with Pamela, Vince, Jillian, and Jia. Pamela's first witness was her best friend, Beverly Alconero. Beverly knew Sean since he was born and described Sean as "like a nephew" to her. Beverly testified that Pamela and Sean vacationed with her family and visited often, including spending every New Year with them. Beverly observed Pamela's relationship with Sean throughout his whole life, and testified that "they were each other's world," with an exceptionally close bond. Beverly also testified that Sean expressed directly to her that he did not want a relationship with Vince, stating, "I don't ever want to talk to that piece of shit again" and referred to Vince as a "sperm donor."

{¶ 9} Pamela's second witness was Jennifer Cinnamon. After Pamela and Vince divorced, Vince married Jennifer, and the couple had two daughters, Jillian and Jia. Jennifer testified that she had a volatile relationship with Vince. Jennifer testified that Vince committed multiple acts of abuse against her and was also abusive toward Sean. Jennifer testified that Vince placed his hands on Sean and shoved his head into a wall during a physical altercation in 2009. Jennifer's testimony confirmed she contacted Pamela after that incident. In response, Pamela obtained a CPO on Sean's behalf, which terminated Vince's parenting time. In 2013, Pamela secured a three-year extension of that protection order.

{¶ 10} Despite the volatile relationship between Vince and Jennifer, Jennifer testified that Sean grew close to Jillian and Jia, keeping in contact with them through social media and visiting them where they lived in Florida. Sean visited Jillian and Jia in Florida just a few short weeks before his death. Jennifer testified that Jillian and Jia took Sean's death hard, staying in their rooms for days, crying, and not eating.

{¶ 11} Vince testified that before he and Pamela divorced and during visitation with Sean after the divorce, he "doted" on Sean. He testified he "loved that kid more than I've ever loved anything in my life." Vince was permitted to resume contact with Sean in 2016, although the record is unclear as to whether any contact occurred. Vince testified that he attended several of Sean's softball games; however, Pamela stated that she never observed Vince at those events. Vince testified that he tried reaching out to Pamela and Sean via social media and email after the protection order expired, in an effort to rebuild a relationship with Sean. But Vince produced no evidence of these social media contacts or emails beyond his testimony. He also testified he and Sean spoke on the phone fairly regularly when Sean was in the Army, but he produced no substantiating phone records.

{¶ 12} After Sean enlisted in the U.S. Army, testimony from Pamela and Vince confirmed he contacted Vince to obtain information needed for his military records. Thereafter, the evidentiary record before this court shows Vince and Sean exchanged limited communications by phone and text. Although Vince expressed a desire to meet in person, Sean remained reluctant, never responding positively to any of Vince's invitations to meet. Vince sent multiple text messages denying any prior abuse and portraying himself as the victim of false allegations. Sean never responded to the vast majority of these text messages from Vince, and when he did, he responded in a perfunctory manner, which did not appear to encourage more communication.

{¶ 13} Vince's witness, Michael Mattina, became acquainted with Vince and Sean through hockey when Sean was young, before any CPO was issued against Vince. He observed Vince and Sean together four or five times and characterized Vince's interactions with Sean as respectful. However, Vince's witness also acknowledged that his observations did not provide a substantive observation of Vince and Sean's relationship.

**C. Probate Court Decision**

{¶ 14} On February 27, 2025, the Probate Court issued a decision awarding $50,000 each to Jillian and Jia (3% each), $200,000 to Vince (12.7%), and the balance to Pamela ($1,275,133.26 - 80.8%).[2] With respect to Vince's award, the Probate Court explained:

> While Vince's relationship with Sean is fairly characterized as poor, and it is beyond dispute that the responsibility for that state of affairs rests upon Vince, the Court finds it significant that Vince was attempting to re-establish a relationship with Sean at the time of his death. For all Vince's deficiencies and misdeeds, we still cannot conclude that he has not suffered a loss within the purview of the statute by Sean's tragic death.

{¶ 15} Pamela now appeals, raising a single assignment of error for review.

**II. Appeal**

*Assignment of Error*

{¶ 16} In her sole assignment of error, Pamela raises two arguments (as alternatives to one another) supporting her contention that the Probate Court erred in its decision allocating wrongful death proceeds to Vince. First, Pamela argues that the Probate Court erred, as a matter of law, because Vince was statutorily barred from receiving a portion of the settlement, on the grounds of his "abandonment" of Sean when he was a minor. Second, Pamela contends that the Probate Court made an "inequitable" distribution considering Vince's abandonment. We decline to consider Pamela's first argument, as she did not raise it before the Probate Court and therefore forfeited its consideration by this court. As to the inequity argument, we reluctantly disagree with

---

2. Pamela and Vince each dispute the percentage the parties received from the distribution. This court calculated the dollar amount the court awarded to each party, expressed as a rounded percentage of the net amount remaining for distribution after attorneys' fees and expenses ($1,578,008.26). The percentage (0.5%) not accounted for in these awards reflects the guardian ad litem fees, which the Probate Court ordered to be paid out of the net settlement before distribution to the beneficiaries.

Pamela, finding the Probate Court did not abuse its discretion, as currently defined in Ohio law.

*Standard of Review*

{¶ 17} This court considers the issue of whether the Probate Court applied the correct legal standard in distributing the wrongful death proceeds as a question of law, which we review de novo. *In re Molitor*, 2013-Ohio-525, ¶ 16 (12th Dist.). De novo review, as relevant here, means this court interprets the statutory language independently, with no deference to the Probate Court's interpretation. *See Otterbein Maineville, L.L.C. v. Carman*, 2025-Ohio-1013, ¶ 31 (12th Dist.).

{¶ 18} On the other hand, we review the Probate Court's distribution of wrongful death proceeds for an abuse of discretion. *Molitor* at ¶ 16. A Probate Court has broad discretion in apportioning wrongful death proceeds among beneficiaries, and this court will not substitute its own judgment for that of the Probate Court unless it abused that broad discretion. *In re Estate of Barnett-Clardy*, 2008-Ohio-6126, ¶ 22 (10th Dist.). The term "abuse of discretion" implies that the court's attitude was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

*Pamela's First Argument—"Abandonment"*

{¶ 19} Ohio law prohibits a "parent who abandoned a minor child who is the decedent" from receiving a benefit in a civil action for wrongful death. R.C. 2125.02(A) ("Wrongful Death Proceedings Statute", "Benefit Ban"). Pamela contends the Probate Court erred as a matter of law by distributing a portion of the proceeds to Vince in contradiction of the Benefit Ban, and this court should apply the de novo standard to our analysis. Pamela acknowledged in briefing to the Probate Court that "the court cannot adjudicate the issue of abandonment when the decedent is not a minor" but contended the court "may consider the elements of abandonment as a factual component of the

proof of loss suffered by any wrongful death beneficiary." But on appeal, Pamela asserts the opposite—arguing that the Benefit Ban applies to any parent who abandoned a child, even if the child dies *after* reaching the age of majority.

{¶ 20} A party who fails to raise an argument in the trial court [forfeits] the right to raise the argument on appeal. *See Niskanen v. Giant Eagle, Inc.,* 2009-Ohio-3626, ¶ 34. An appellate court may apply the doctrine of plain error to a forfeited argument. *Risner v. Ohio Dept. of Natural Resources, Ohio Div. of Wildlife*, 2015-Ohio-3731, ¶ 27. However, in the context of a civil case, applying the plain error doctrine should be "strictly limited to the *extremely rare* case involving *exceptional* circumstances when the error, left unobjected to at the trial court, rises to the level of challenging the legitimacy of the underlying judicial process itself." (Cleaned up.) *Id*.

{¶ 21} Pamela presents no such exceptional circumstance here, given that she not only failed to assert her current interpretation of the Benefit Ban but acknowledged the opposite viewpoint before the Probate Court. The record before this court contains no analysis from the Probate Court that it considered Pamela's forfeited argument. This court will not consider what the Probate Court did not. We decline to consider Pamela's statutory interpretation argument regarding whether the Benefit Ban applies to a parent who allegedly abandoned a child, even if the child dies after reaching the age of majority.

*Pamela's Second Argument—"Inequitable" Distribution*

{¶ 22} Pamela contends that the Probate Court "lost its way by providing Vince with an inequitable share of damages based on the testimony and evidence from the hearing." She asserts that the "smattering of text messages that Vince exchanged with Sean over a period of a few months in the year before his death is insufficient to establish that providing him with a recovery would be equitable to Sean's other heirs." Pamela

questions whether the Probate Court properly determined Vince suffered injury and loss, arguing that awarding anything more than minimal damages to an estranged parent amounts to an abuse of discretion. And Pamela incorporates her argument of Vince's "abandonment" of Sean to support her contention that the Probate Court abused its discretion by awarding an "inequitable" distribution. Vince denies he abandoned Sean and emphasizes his grief over Sean's death.[3]

*Applicable Law*

{¶ 23} Again, we review a trial court's apportionment of wrongful death proceeds for an abuse of discretion, which implies the court's attitude was unreasonable, arbitrary, or unconscionable. *See In re Dye*, 2012-Ohio-2570, ¶ 69 (12th Dist.); *see also Blakemore*, 5 Ohio St.3d at 219. While courts often parrot the "unreasonable, arbitrary, or unconscionable" language from this standard of review without much explanation, we find that this case requires an exploration of what each of these terms means, and how each is applied in Ohio law.

{¶ 24} Unreasonable first. A decision is unreasonable where a sound reasoning process does not support it. *State v. Ford*, 2019-Ohio-4539, ¶ 106, quoting *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.,* 50 Ohio St.3d 157, 161 (1990). This court does not have the authority to find a trial court abused its discretion simply because we would not have reached the same conclusion or because we are "less persuaded by the trial court's reasoning process than by the countervailing arguments." (Cleaned up.) *Westlake Civ. Serv. Comm. v. Pietrick*, 2015-Ohio-961, ¶ 36.

---

3. During oral argument, Vince's counsel stated he "did not want to cast aspersions on" a mother who lost her child," but then expressed astonishment that Pamela brought this appeal and attributed it to her "vindictiveness and/or greed." We strongly disagree with counsel's characterization of Pamela and his decision to make this statement when she was sitting in attendance.

{¶ 25} Arbitrary next. "'An arbitrary decision is one that lacks adequate determining principle and is not governed by any fixed rules or standard.'" *Dickenson v. Jackson*, 2024-Ohio-1236, ¶ 19 (12th Dist.), quoting *Crawford v. Fisher*, 2015-Ohio-114, ¶ 5 (10th Dist.). Within the context of a wrongful death award distribution, a court does not act in an arbitrary manner when it "ma[kes] detailed findings from the evidence to support its award." *Dye* at ¶ 70.

{¶ 26} Unconscionable last. Unconscionable means "affronting the sense of justice, decency, or reasonableness," "shockingly unjust or unfair." *Black's Law Dictionary* (12th Ed. 2024); *see also Gamble v. Gamble*, 2025-Ohio-2381, ¶ 23 (12th Dist.). One might think that when the definition of a term includes phrases such as "sense of justice," "decency," "shockingly unjust," and "unfair," Ohio law would be replete with examples of a court's in-depth consideration of how to apply "unconscionable" from a wide range of legal issues touching on the most important aspects of our lives. Certainly, cases involving liberty and family would rank among the most important where the question of unconscionability might rear its ugly head, prompting substantive analysis of its boundaries. But Ohio case law provides "shockingly" little substantive analysis of unconscionability outside of one context—contracts. In analyzing whether contracts and arbitration agreements are unconscionable, courts incorporate two distinct concepts: "(1) unfair and unreasonable contract terms, i.e., substantive unconscionability; and (2) unequal bargaining power such that the other party lacks a "meaningful choice" to enter into the contract, i.e., procedural unconscionability." *Dozier v. Credit Acceptance Corp.*, 2019-Ohio-4354, ¶ 13 (8th Dist.). Now that we have provided the context for what unreasonable, arbitrary, and unconscionable generally means, and how those terms are analyzed when this court applies an abuse of discretion standard, we turn to the applicable law for wrongful death distributions.

{¶ 27} A probate court's authority to apportion wrongful death proceeds arises out of R.C. 2125.03(A)(1) ("Wrongful Death Distribution Statute"). *Molitor*, 2013-Ohio-525, at ¶ 17, citing *Barnett-Clardy*, 2008-Ohio-6126, at ¶ 18. The Wrongful Death Distribution Statute requires the probate court to distribute wrongful death proceeds in such "a manner as is equitable, having due regard for the injury and loss to each beneficiary resulting from the death and for the age and condition of the beneficiaries." R.C. 2125.03(A)(1).

{¶ 28} The Wrongful Death Proceedings Statute provides a non-exhaustive list of criteria upon which compensatory damages may be awarded, including the loss of support and services, loss of companionship, consortium, care, attention, loss of prospective inheritance, and the mental anguish suffered by the parents or next of kin. R.C. 2125.02(D); *see also Dye*, 2012-Ohio-2570, at ¶ 68 (applying former R.C. 2125.02[B]). There is no precise mathematical formula for apportioning wrongful death proceeds. *Molitor* at ¶17. However, the Wrongful Death Proceedings Statute provides that the surviving spouse, children, and parents of a decedent are "rebuttably presumed to have suffered damages by reason of the wrongful death." R.C. 2125.02(A). A party who wants to challenge an award has the burden to present clear and convincing evidence to the court rebutting the presumption that a spouse, child, or parent suffered damages by the death of the decedent. *See In re Estate of Marinelli*, 99 Ohio App.3d 372, 379 (11th Dist. 1994). We note that the Probate Court was in the best position to assess credibility and determine an equitable allocation of wrongful death proceeds. *Dye* at ¶ 72.

*Analysis*

{¶ 29} Here, the Probate Court considered the evidence and found that Pamela had a much closer relationship with Sean than Vince. The Probate Court noted that Pamela provided nearly all of Sean's financial and emotional support from 2009 until his high school graduation. It further found that Sean's relationship with Vince was "fairly

characterized as poor," and that "it is beyond dispute that the responsibility for that state of affairs rests upon Vince." Nevertheless, the Probate Court found it significant that Vince had been attempting to reestablish a relationship with Sean at the time of Sean's death. While the Probate Court squarely attributed the deficiencies in that relationship to Vince, it concluded that Vince nevertheless suffered a compensable loss within the meaning of the statute.

{¶ 30} Although Pamela argues that Vince constructively "abandoned" Sean and the Probate Court should have considered that factual context when it determined the award, the Probate Court's discussion of abandonment was limited. It noted that Vince generally exercised his visitation rights following the parties' divorce, until those visits ceased after the issuance of the CPO on Sean's behalf. The Probate Court then considered Vince's contact with Sean after visitation became permissible, including the disputed testimony regarding Vince's attendance at Sean's softball games. The Probate Court characterized Vince's attendance, if any, as "de minimis." The Probate Court also addressed support, observing that neither party provided a child support payment history, though it was undisputed that Vince's payments were intermittent and that he continued to pay off an arrearage. The Probate Court also made Vince's award subject to any liens. The record before this court indicates that Hamilton County has asserted liens against Vince for child support arrearage he owes Jillian and Jia, which totals over $30,000.

{¶ 31} The Probate Court, however, found it significant that Vince had begun efforts to reestablish a relationship with Sean prior to his death. A review of the record reflects that Vince expressed grief and a sense of loss resulting from Sean's sudden passing. Thus, although the Probate Court allocated a substantially larger share of the proceeds to Pamela, it concluded, "[f]or all Father's deficiencies and misdeeds, we still cannot conclude that he has not suffered a loss within the purview of the statute by Sean's

tragic death." *See Barnett-Clardy*, 2008-Ohio-6126, at ¶ 23 (finding no abuse of discretion where a father received 10% of proceeds despite minimal contact); *In re Estate of McFarland*, 1991 Ohio App. LEXIS 5215, *7 (6th Dist. Nov. 1, 1991) (awarding 10% of proceeds to a father with limited involvement).

{¶ 32} While Vince's relationship with Sean was markedly less substantial than the ongoing, lifetime relationship and bond he shared with Pamela, we find the Probate Court did not abuse the broad discretion we must afford it. Its decision was not unreasonable because it exercised a sound reasoning process by evaluating and considering evidence of both Pamela and Vince's relationship with Sean that was properly before it. Likewise, the Probate Court's decision was not arbitrary—it made some detailed findings regarding which evidence it considered as well as how it weighed that evidence.

{¶ 33} Some might find an award of $200,000 to a father who had virtually no contact with his son in over a decade unconscionable. It might affront their sense of justice or decency to know that a father receives that kind of award when the record shows the son wanted nothing to do with the father (or "sperm donor," as the son referred to him). Others might find it shockingly unjust or unfair that a father, who was prohibited from seeing his son for years because of instances of abuse witnessed or experienced by the son at the hands of that same father, receives a six-figure award after that son is tragically killed in the prime of his life. But current Ohio law does not permit this court to make such a finding.

{¶ 34} After all, this case does not involve a contract or arbitration dispute, where unfair contract terms and a lack of meaningful choice within that contract can be evaluated. It merely involves an award of money to compensate, in some infinitely small measure, for the unfathomable loss of a child, who you presumably loved and cared for throughout his life. Ohio law does not support the finding that Sean's expressed views of

- 13 -

Vince and their relationship should be taken into consideration of unconscionability, even if that means Sean's thoughts will receive no weight. Current Ohio law on unconscionability does not support this court finding that the Probate Court's award was fundamentally unfair considering the lack of relationship between Vince and Sean, and Sean's complete inability to have a meaningful choice or influence over how this award should be distributed. Until and unless the Supreme Court of Ohio decides to substantively apply what unconscionability means outside of the context of a contract, this court has no basis in law to do so.

{¶ 35} This case presents unimaginably difficult circumstances, and although we might have reached a different conclusion, we cannot say that the Probate Court's decision was unreasonable, arbitrary, or unconscionable under current Ohio law. From our review, it appears the Probate Court implicitly found that Pamela failed to meet her burden of rebutting the presumption Vince suffered loss and injury as Sean's father. For these reasons, we find no abuse of discretion in the trial court's determination.

{¶ 36} Following our review, we overrule Pamela's assignment of error and affirm the Probate Court's allocation of wrongful death proceeds.

{¶ 37} Judgment affirmed.

HENDRICKSON, P.J., and BYRNE, J., concur.

## JUDGMENT ENTRY

The assignment of error properly before this court having been ruled upon, it is the order of this court that the judgment or final order appealed from be, and the same hereby is, affirmed. It is further ordered that appellant's December 4, 2025 motion to strike filings extraneous to the record is hereby denied.

It is further ordered that a mandate be sent to the Butler County Court of Common Pleas, Probate Division, for execution upon this judgment and that a certified copy of this

Opinion and Judgment Entry shall constitute the mandate pursuant to App.R. 27.

Costs to be taxed in compliance with App.R. 24.

/s/ Robert A. Hendrickson, Presiding Judge

/s/ Matthew R. Byrne, Judge

/s/ Melena S. Siebert, Judge